LILLY ANHEUSER SUHRE v. ADOLPHUS BUSCH III and AUGUST A. BUSCH, JR., Executors of the Will of AUGUST A. BUSCH, Appellants.—120 S. W. (2d) 47.

Division One, October 10, 1938.*

---

*NOTE: Opinion filed at May Term, 1938, May 26, 1938; motion for rehearing filed; motion overruled at September Term, October 10, 1938.

*Buder & Buder* and *G. A. Buder, Jr.,* for appellant.

174

*Nagel, Kirby, Orrick & Shepley* and *Daniel N. Kirby* for respondents.

178

HYDE, C.—This is an action for specific performance of agreements granting the right to repurchase 812½ shares of stock of Anheuser-Busch, Inc., which was sold with the right to repurchase same within five years. The original defendant died before trial and the cause was revived against his executors. The trial court entered a decree requiring transfer of the stock to plaintiff upon payment of $56,187.48 (when suit was brought the value of this stock was more than double this amount) with interest at 6% from June 20, 1936, until paid. Both parties have appealed. Defendants seek reversal; plaintiff seeks only modification to eliminate payment of interest.

The theory of plaintiff's action is shown by the following portion of Count Two (both counts use the same language) of the petition:

"On or about the 16th day of April, 1926, she made and entered into an agreement in writing with the defendant whereby defendant purchased from the plaintiff three hundred and seventy-five (375) shares of stock of the par value of one hundred dollars ($100.00) each of the said Anheuser-Busch, Incorporated, for the sum of twenty-two thousand dollars ($22,000.00), with the understanding and upon the condition that plaintiff reserved and retained the right at any time within five (5) years thereafter to repurchase said aforementioned stock together with all stock dividends declared thereon by repaying to the defendant the said sum of twenty-two thousand dollars ($22,000.00), plus interest at the rate of six per cent (6%) per annum, minus any cash dividends. . . . That on or before the 16th day of April, 1931, she was

ready, willing and able to pay the necessary amount to obtain possession and redelivery of said three hundred and seventy-five (375) shares of stock of Anheuser-Busch, Incorporated; that she then sought and requested of the defendant and his agents and servants information as to the amount then required to redeem and repurchase the said three hundred and seventy-five (375) shares of stock of Anheuser-Busch, Incorporated, and stock dividends thereon, after offsetting the cash dividends, if any, against the amount of principal and interest, and offered and endeavored to redeem and repurchase said stock, but that said information was refused and denied her and that defendant and his agents and servants declined, failed and refused to return and reconvey said stock. . . . (Defendants') unwillingness, failure and refusal to deliver said stock to her continued without interruption until the month of May, 1931, at which time she was advised that said stock might then be repurchased; that between the date of her original request for information as to the exact amount necessary in order to accomplish and consummate the redemption and repurchase of said stock and the date on which she was advised that defendant was ready to furnish said information and make redelivery and conveyance of said stock upon payment of the proper amount, business, economic and financial conditions and conditions in the money and security markets became materially changed and altered and that by reason thereof she was not able to make payment of the amount necessary to redeem and repurchase her said stock when defendant advised her of his willingness to accept payment and make redelivery thereof; and that the changed and altered conditions in money and security markets, and plaintiff's consequent inability to pay, continued without interruption until the month of April, 1933." (Defendants' answer admitted the agreements and certain other specific allegations but generally denied all others.)

The agreements, upon which Count One of the action is based are, as follows:

"Mrs. Lilly Suhre March 16, 1925.

"Saint Louis, Missouri.

"Dear Mrs. Suhre:

"Confirming our conversation of today, beg. to advise that I will purchase from you one and one-sixth shares of stock of Anheuser-Busch, Incorporated, on the basis of twenty-one thousand dollars ($21,000.00) per share, or twenty-four thousand five hundred dollars ($24,500.00) for the one and one-sixth shares. You are to have the right to repurchase the one and one-sixth shares of the stock of Anheuser-Busch, Incorporated, at any time within five years from date on re-payment to me of twenty-four thousand five hundred dollars ($24,500.00) plus six per cent interest per annum, and you are to receive credit for any dividends which the stock may pay

in the meantime. These dividends will be collected by me and repaid to you only in the event that you repurchase the stock as set out herein. This right to repurchase the stock will be binding on my heirs, executors and assigns but is to be entirely personal so far as you are concerned and cannot be assigned by you and will not vest in your heirs or executors. Sincerely yours, (Signed) Aug. A. Busch. Accepted:

"Signed Lilly Suhre."

"St. Louis, Missouri,

"March 15, 1930.

"In consideration of the sum of one dollar and other good and valuable consideration to me paid this day by said Lilly Suhre, and at her request, the term of the foregoing agreement is hereby extended for an additional period of one year from this day, and the agreement shall be construed as applying to four hundred thirty-seven and one-half (437½ shares of a par value of one hundred dollars ($100.00) each of the capital stock of Anheuser-Busch, Inc. (Incorporated in 1925) as successor to Anheuser-Busch, Inc. (Incorporated in 1875.)

"(Signed) Aug. A. Busch. Accepted: Lilly Suhre."

The agreement upon which the second count of plaintiff's petition was based was, as follows:

"Mrs. Lilly Suhre, April 16, 1926.

"2915 Geyer Avenue,

"St. Louis.

"My dear Lilly:

"Complying with your request that I do so, I am willing and hereby offer and agree to buy from you three hundred and seventy-five (375) shares of your stock in Anheuser-Busch, Incorporated, at the lump sum price of Twenty-two Thousand Dollars ($22,000.00) cash, payable on delivery of the stock certificates duly endorsed and stamped for transfer, such purchase to be subject to these conditions and agreements, viz:

"(1) You personally (but no one else—not your executors, administrators, legatees nor your or their assigns) shall have the exclusive right at any time within five years from the date of this letter, to repurchase said shares (together with any stock dividends that I may receive thereon) from me (or from my executors, administrators, legatees or assigns) at a price to be paid in cash, the amount of which cash payment for repurchase by you shall be determined by my charging you Twenty-two Thousand Dollars ($22,-000.00) plus interest thereon at the rate of six (6) per cent per annum from the date when I shall have made the purchase from you—and by my crediting you at the dates they are received by me, with all cash dividends that may be declared and paid upon said shares

during such part of said five years as said shares may remain not repurchased by you; and

"(2) I agree during said five years period, to hold said shares available for such repurchase by you hereunder, and the rights granted you hereby shall be binding on my executors, administrators, legatees and assigns.

"I have signed and submitted two copies of this letter, so that each of us may have an original signed copy, and your signature to the acceptance clause at the foot of the same two copies, will make this a binding contract. Cordially yours, (Signed) Aug. A. Busch,

"April 22nd, 1926. I hereby accept and agree to the above offer.

"(Signed) Lilly A. Suhre."

The case was tried by both parties upon the theory that both agreements had substantially the same meaning; and that the rights of the parties depended upon the construction of these agreements. Plaintiff's position is that her failure to complete the purchase, within the time designated, was due to the absence of Mr. Busch from his office. This was the trial court's view as shown by the following finding in its decree:

"That on April 16, 1931, the plaintiff was ready, willing and able to pay the repurchase price of her stock under both of the contracts aforementioned, and then sought and endeavored to repurchase her said stock, but that plaintiff was unable, by reasonable and diligent effort on her part, to repurchase her said stock because of the default and delay of defendants' testator and the breach of said contracts on his part."

Plaintiff contended that she was "entitled to invoke the rule of law that, where a party is prevented by the acts of the adverse party from performing the provisions of the contract within the stipulated time, he has not only the length of time, that he had been delayed in the performance of the option, in which to perform, but has (additional) reasonable time under the prevailing circumstances within which to complete performance under the contract." Plaintiff claimed that her tender two years later was within a reasonable time. The court upheld that theory, finding "that plaintiff's right to repurchase the 437½ shares and the 375 shares, respectively, of stock in Anheuser-Busch, Inc., hereinabove mentioned, had not expired when plaintiff, on April 20, 1933, offered and sought to repurchase said stock or when plaintiff, on May 12, 1933, made her tender to August A. Busch, and the demand on him, for the purpose of repurchasing her said stock; that plaintiff's tender and her demand for the return and delivery of her stock on May 12, 1933, was not too late, and said demand at that time was not unreasonable or inequitable to defendants' testator; and that the rejection of said demand by August A. Busch was without just cause or excuse." Defendants

contend that plaintiff was not entitled to a decree of specific performance because she held mere unilateral options, which never acquired mutuality, and, therefore, were unenforceable in equity; and that plaintiff failed to repurchase because of her financial inability to pay and not because of anything that Mr. Busch did or failed to do.

On behalf of plaintiff, the only witnesses as to the material facts were herself and husband and Mr. Mark C. Steinberg, a stock broker. Plaintiff said that prior to March 15, 1931, she talked to Mr. Busch regarding the expiration of the first agreement, as extended, and that he said: ''Lilly, don't bother about that one which is due March 15th; take that up at the same time which the second one expires; take them both up at the same time.'' Plaintiff, following this suggestion, sought to make preparations for repurchasing her stock under both agreements by April 16, 1931. Plaintiff's husband, in March, 1931, applied to Mr. Steinberg for a loan. On April 15, 1931, plaintiff visited Mr. Steinberg in company with her husband and informed him she was willing to deposit the 812½ shares of Anheuser-Busch stock as security and Mr. Steinberg said he was willing to loan her $75 a share thereon, the loan to be for a period of two years, bearing interest at six per cent (6%) per annum. Mr. Suhre, on the following day, April 16, 1931, went to the offices of Anheuser-Busch, but found that Mr. Busch was at home ill and Mr. R. A. Huber, Mr. Busch's representative and confident, was out of the city. Mr. Suhre talked to Mr. W. Fred Anheuser, vice-president of the brewery, Mrs. Schofield, private secretary to Mr. Busch, his son Adolphus Busch III, and Mr. George A. H. Mills, secretary of the brewery. He said that he informed each of them that he came ''to find out what amount was due on the stock;'' and that he ''was down there to get the stock . . . to take up the stock, as it was the last day.'' None of them were able to furnish Mr. Suhre with the information as to the amounts necessary to repurchase, or to deliver the stock, or to do anything in Mr. Busch's absence. According to plaintiff and her husband, they went to see Mr. Huber, as soon as he returned to his office, on Saturday, April 18, 1931, and were told by him that Mr. Busch was still at home ill, could not be disturbed, and that he, Huber, could not speak or act for Mr. Busch. They said they made other visits to his office and were told the same thing. It is, however, conceded by defendants that Mr. Busch told Mr. Huber ''he would not take any technical advantage of a day or two.'' It is likewise undisputed that on some day in May plaintiff was notified that the deal must be closed on that day and would not be extended longer, but there is a conflict as to this date.

Plaintiff's husband testified as to the situation of April 16, 1931, as follows:

''Q. Had you informed Mr. August A. Busch or Mr. R. A. Huber or any representative of Mr. Busch that you expected to be ready

to buy those shares on April 16, 1931? A. No, sir. Q. Gave them no information that you expected to go down there and close the purchase? A. No, sir. Q. You hadn't given them information of the fact that you had theretofore called on Mr. Steinberg and that he had told you that he would lend the money when the time came? A. No, sir. (Neither he nor plaintiff ever disclosed to Mr. Busch or Mr. Huber their expected source of financing the purchase.) . . . Q. When you went there (on April 16, 1931), did you have the money or a certified or cashier's check with which to rebuy the shares? A. No, sir.''

As to subsequent developments, plaintiff testified:

"I made other visits to the brewery after April 18, 1931. I went down the following week, and twice on those visits I saw Mr. Heimbacher and he told me that Mr. Huber was at a meeting and he did not know when he would return; and on three or four other occasions I spoke to Mr. Huber and Mr. Huber still informed me that Mr. Busch was at home sick and couldn't be disturbed, and that he couldn't act for Mr. Busch; and on my last visit he said he didn't see that it was necessary for me to come down any more until Mr. Busch's return to the office, that he could not do anything until he returned. I should judge that this last visit must have been eight or ten days after April 18th, about ten days.

"I next heard of the matter on Friday, May 15th. Mr. Heimbacher telephoned me and . . . said, 'Mr. Busch is now ready to take up that stock' and to 'bring a check down for forty-seven thousand some odd hundred dollars, but it would have to be this afternoon' and I looked at the time, and I said, 'Oh, Mr. Heimbacher, it is 11 o'clock. That is a very short notice,' and he said, 'Just a minute,' and he came back and he said, 'I am sorry, but it has got to be taken up today.' ''

Mr. Suhre also testified concerning this final notification, as follows:

"I had a conversation with Mr. Heimbacher on Friday, May 15, 1931, in regard to this stock transaction. I rang him up after Mrs. Suhre informed me that we could take up our agreement with Mr. Busch. I asked Mr. Heimbacher what it was about the stock and he informed me that Mr. Huber was ready to go through the agreement with Mr. Busch, and I called his attention to it being 11 o'clock that day and it would be pretty hard to make arrangements by 2 o'clock, and he said, 'Wait a minute,' and he came back and said the agreements would have to be taken up that day. . . . My recollection is the market was going up from the middle of March, about the first of April, and the recession began about the middle of April. After that there were recurring drops and exceptional breaks.''

Neither plaintiff nor her husband made any attempt to get the money on that day, but on the following day, May 16th, they called

on Mr. Steinberg. They had never signed a note nor, in fact, even informed him prior to that time that they would accept his proposition to make them a loan. Mr. Steinberg refused to make them the loan then for that reason and because the market was establishing "new lows." Mr. Suhre said that he made extensive efforts to raise the money elsewhere, and that he was not, until April, 1933, able to secure the money. They had no way to raise it except to borrow the entire purchase price on the stock they desired to buy. More than two years after the date when the options expired by their terms, plaintiff made a tender and it was refused.

During all the time specified in these agreements, national prohibition was in force, preventing the Anheuser-Busch Company from making beer, its principle product. Defendants showed that the company's net income had declined annually for several years prior to 1931; that it had a net loss of more than a half-million dollars on 1931 operations; and that "the bid and asked price" of its stock in 1931 ranged from $40 to $60 per share with no actual sales. (Mr. Steinberg said he sold his own 625 shares in January, 1930, for $64 per share.) In October, 1932, the stock became more active, and by November it brought from $115 to $150 per share. During February and March of 1933, sale prices were from $105 to $145 per share. In April, 1933, sale prices ranged from $145 to $153 per share, and in May, 1933 (when plaintiff made tender) they were from $181 to $186 per share. Plaintiff's husband wrote, in June, 1932, to Mr. Huber making certain claims concerning stock dividends. Mr. Huber answered that plaintiff had rights as to dividends "only in the event of repurchase, and as this option was not exercised, the completed sale stood as originally made;" and that "we cannot recognize any claims which Mrs. Suhre might make to any part of the stock or its earnings." Plaintiff made no further claim, until after beer was legalized by amendment of the Volstead Act on March 22, 1933, 48 Stat. 16.

Because of the view we take, further evidence of defendants will not be set out. It is sufficient to say that it did not help plaintiff, except as to extension of time up to May 15, 1931; that Mr. Huber denied plaintiff's testimony that he said he could not act for Mr. Busch; that Mr. Huber said he would have closed the deal if the cash price had been paid, and did begin to figure the amount due; but that the deal was not closed at their first meeting in April, 1931, because all that plaintiff's husband offered to use for cash to obtain delivery of the certificates was his own personal check; and that Mr. Huber required a certified check or cashier's check before he would make such delivery. We will consider the evidence sufficient to show that both repurchase options were in force on the 16th day of April, 1931, and that they were thereafter left open, or extended from day to day, up to and including May 15, 1931.

It will clarify the issues to eliminate, at the outset, matters not involved which could make the situation entirely different. The question sometimes arises on repurchase options as to whether or not the transaction was, in fact, a loan secured by an equitable mortgage. Plaintiff cites In Re Ferguson's Estate, 124 Mo. 574, 27 S. W. 513, which was not a repurchase agreement but stated that Ferguson "will hold said property as security" for a $10,000 note owned by him which had been a lien on the property. [See, also, 27 R. C. L. 337, sec. 83; 19 R. C. L. 261, sec. 29; 7 R. C. L. 274, sec. 252; 10 Am. Jur. 719-722.] If these transactions could be construed to be loans (secured by pledge of stock), we would of course have to apply different principles of law. The effect of failure to pay on maturity of a loan is very different from the effect of failure to make performance of a contract when time is of its essence; but there is no question of a loan and equitable mortgage in this case because the undisputed evidence is that Mr. Busch refused at the start to make a loan, and plaintiff makes no such claim by pleading or proof. Plaintiff's petition designated each original transaction as "an agreement . . . whereby defendant purchased from plaintiff" the shares described. Furthermore, to have a mortgage (securing a loan), there must be a debt. [11 C. J. 413, sec. 15; James on Option Contracts, sec. 115.] The intent of both parties was for Mr. Busch to take all the risk so that if the stock became worthless he could collect nothing from plaintiff; but that if, during the time specified, it increased in value above the designated price, she could buy it at the designated price. [See 55 C. J. 592, sec. 601.] (It is to be noted that this stock did not increase in value during the option period.) It thus clearly appears plaintiff did not claim (or attempt to make such a case by pleading or proof) that these agreements should be reformed; that there was any fraud, mistake, or misunderstanding in making them; or that there was any other agreement made or intended (except extensions) different from what is written. Therefore, considering plaintiff's action to be for specific performance of these agreements as written and the rights of the parties to be fixed by their terms, we will determine whether there was substantial evidence to support the findings of the decree essential to plaintiff's case.

We recently discussed the nature of an option contract and thus stated our conclusions. "The principle of law upon which an option contract is based 'is that the bond or conditional covenant to convey upon the option of the lessee or vendee is a continuing offer on the part of the vendor or owner, until accepted within the time and on the terms limited in the option, and, when accepted, it becomes a valid agreement, supported by mutual promises of competent parties.' [Warren v. Castello, 109 Mo. 338, 19 S. W. 29, 30, 32 Am. St. Rep. 669; Aiple-Hemmelmann Real Estate Co. v. Spelbrink, 211

Mo. 671, 111 S. W. 480, 14 Ann. Cas. 652; Gillen v. Bayfield, 329
Mo. 681, 46 S. W. (2d) 571, 575; American Law Institute's Restate-
ment of Contracts, secs. 24, 46 and 47.] The optionee does not ordi-
narily promise in the option contract (and did not in this one) to
pay anything. He gives consideration only to make a continuing
offer irrevocable during the option period. 'An option means a priv-
ilege, . . . a right of election to exercise a privilege.' [Yontz
v. McVean, 202 Mo. App. 377, 217 S. W. 1000, 1001.] It requires
something more than the option contract to find the optionee's prom-
ise to buy or to pay." [Lively v. Tabor, 341 Mo. 352, 107 S. W. (2d)
62.] The principle is likewise stated by Professor Williston: "An
option is a term of business usage rather than of strictly legal
nomenclature, and has frequently been used to include indiscriminate-
ly both binding conditional contracts and mere unsealed offers with-
out consideration. Such an offer has of course no binding force either
at law or in equity; but an option for which consideration has been
given is both an offer and also a unilateral contract. The only dif-
ference in the two kinds of offers is that the former kind is revocable.
In either case when the offer is seasonably accepted a new bilateral
contract arises, and it is, strictly speaking, this contract which is
specifically enforced." [3 Williston on Contracts, 2565, sec. 1441;
for further discussion see 1 Williston 73, sec. 44, p. 106, sec. 6; Ann.
Cas. 1913A, 365, note; 66 C. J. 488, sec. 13; 27 R. C. L. 334, sec.
31; Starr v. Crenshaw, 279 Mo. 344, 213 S. W. 811; James on Op-
tion Contracts, secs. 801, 814, 1202, 1224, and 1230.]

▮ It is clear here that plaintiff never did promise uncondition-
ally to repurchase (in the contracts or otherwise) and was never
bound to do so; and that Mr. Busch did promise in the contracts
to sell and was bound to do so at the price stated, but only in case
plaintiff, within the time designated, did what was required of her
to accept his continuing offer to sell. By his extensions, after April
16, 1931, he left his continuing offer to sell open for 30 days longer,
but plaintiff never, at any time during that year, made any kind of
tender (cash tender was not necessary because only certified check
or cashier's check was asked); and on the last day designated in
the written agreements, plaintiff's husband went to Mr. Busch's of-
fice without cash, draft, cashier's check, or certified check and with-
out having actually borrowed the money required to make the re-
purchase. Plaintiff considers these agreements as though they were
*absolute contracts to repurchase* (which they are not) instead of
*options to repurchase* (which they are), and asserts rights thereunder
(as to time and manner of performance) which she could only have
under a bilateral contract binding upon her to buy in addition to
binding him to sell. Plaintiff's argument is that the right to re-
purchase was a vital part of the original contract to sell without
which plaintiff would not have agreed to part with her stock; that

the contracts cannot be divided "into two separate and unrelated agreements, one having to do solely with the sale of the stock and the other referring only to the repurchase thereof;" and that considering the agreement giving plaintiff the right to repurchase in connection with her agreement to sell shows sufficient mutuality to support a decree of specific performance. The agreement to sell does show consideration for making irrevocable the continuing offer to allow plaintiff to repurchase (James on Option Contracts, sec. 315); but it does not show a bilateral contract for repurchase because plaintiff was not bound to buy. The sale contracts were fully executed by complete performance by both parties and only the rights to repurchase remained. These were executory and solely optional with plaintiff until accepted; and, except that the sale agreement furnished the consideration for them, these repurchase agreements were "otherwise a distinct contract." [See Rockhill Tennis Club v. Volker, 331 Mo. 947, 56 S. W. (2d) 9, l. c. 17.] They were clearly unilateral requiring some act on the part of plaintiff within their term to bind either party beyond the time set.

The next question is: What was plaintiff required to do to accept these continuing irrevocable (during the time specified) offers? These contracts gave the right to repurchase "at any time within five years from the date . . . (second contract) at a price to be paid in cash," or (first contract) "on repayment to me of $24,500.00" etc. It is fundamental, of course, that acceptance must be in accordance with the terms of the offer and cannot be made in some manner contrary to the method provided. [Restatement of Contracts, secs. 52, 59, 62.] In Starr v. Crenshaw, supra, the optionee accepted the option within the time specified and in accordance with its terms by depositing $6000 first payment at the bank designated and offering to complete performance of the requirement to make notes and trust deeds for the balance or to pay the balance in cash. This was held to entitle him to have a decree of specific performance. In Lively v. Tabor, supra, we said that "acceptance of an option is usually intended to be made by performance by the optionee;" and that the contract there considered "clearly meant that no one had any further rights under it unless there was acceptance by full performance or valid tender thereof." In James on Option Contracts, section 914, it is said: "If, by the terms of the option, payment of the price . . . is made a condition precedent to the exercise of the right to buy . . . the money must be paid or tendered and a mere notice of intention to buy, or that the optionee will take the property, . . . does not raise a binding promise on the part of the optionor" beyond the option term. In 66 Corpus Juris 500, section 24, the rule is stated: "Where an option contract provides for payment of all or a portion of the purchase price in order to exercise the option, to entitle the optionee to a conveyance he must, as a rule, not only

accept the offer but pay or tender the price within the prescribed time.'' [See also 27 R. C. L. 344, sec. 41; 101 A. L. R. 1432, note; James on Option Contracts, secs. 915-918.] Even in the case of a bilateral contract, when time is of the essence of the contract as to performance, it is necessary for the purchaser ''to tender performance within the time required by their agreement'' in order to be ''entitled to the aid of a court of equity unless there be something in the facts to take the case out of the usual rule.'' [Wimer v. Wagner, 323 Mo. 1156, 20 S. W. (2d) 650; see also Restatement of Contracts, sec. 374, illustration 2, p. 688.] Of course, a valid exercise of an option could be made (so as to create a bilateral contract) by an unconditional promise to perform binding on the optionee if the optionor accepted it (or agreed to do so) in lieu of actual performance. [See Northern Illinois Coal Corp. v. Cryder (Ill.), 197 N. E. 750, 101 A. L. R. 1425; Jones on Option Contracts, Chapter VIII, also Chapter XI, sec. 1101.] But there is nothing like that in this case both because plaintiff's own evidence shows that no such unconditional promise was made by plaintiff and because the contracts show that the optionor required acceptance by payment ''in cash'' instead of by promises.

Plaintiff cites Lane v. Nunn, 211 Mo. App. 280, 243 S. W. 427, and similar cases. In the Lane case, it could be said that there was a valid bilateral resale agreement, not when the option to resell was given but when plaintiff exercised it by acceptance of defendants' offer to buy back within the time in which the court held that plaintiff had under the contract to make acceptance. The court there said that ''the expression 'at the end of one year' is equivalent to 'after the end of one year;' '' and held that time ''was not . . . such an essence of the contract'' at least as to performance so as to require the plaintiff to tender her stock ''on the precise day on which the year ended,'' since plaintiff had ''notified him (defendant) before the year was out that she did not want the stock.'' The court did not clearly hold whether or not notification within the year was acceptance, but the basis of this decision was the ruling that time was not of the essence of the contract involved. The court further held that defendant would not be released because of delay in performance by plaintiff, when time was not of the essence, ''unless he shows damage to himself by such delay, or such an unreasonable or intentional and willful delay as will evince an intention on the part of the delaying party to treat the contract as at an end.'' [For discussion of agreements to repurchase at request of buyer see 14 C. J. 687-688, sec. 1058.] The Lane case recognizes that in a true option contract ''time is considered as of the essence of the contract.'' We have held that the agreements involved herein were repurchase options, and it is to be noted that they did not use such expressions as ''at the end of one year'' or ''at the expiration of one year'' as in

the Lane case; but only gave plaintiff the right to repurchase "at any time *within* five years." Plaintiff herself testified that prior to April 16, 1931, she requested and Mr. Busch refused extension of time beyond that date. Both parties thus recognized that time was of the essence of the agreements. [See Wimer v. Wagner, supra.] "If an option is given which is to be accepted by payment within a given time, then the time of the payment is certainly essential." [Pomeroy's Specific Performance of Contracts 821, sec. 387.] For these reasons, we must hold both that time was of the essence of these repurchase options and that act required to accept them was payment of the amount specified within the required time.

 Plaintiff seeks to excuse her failure to make or tender performance in this case by the claim that there was a breach of the contract because Mr. Busch and Mr. Huber were absent from the office on April 16, 1931, and that she was prevented from making performance by Mr. Huber's alleged subsequent refusal to act in the absence of Mr. Busch. However, plaintiff overlooks the fact that payment or tender at his office could have created a bilateral contract (as was done in the case in Starr v. Crenshaw, supra) which she could have enforced. [James on Option Contracts, sec. 904.] A purchaser's duties (even under a bilateral contract when time of performance is of its essence), in order to preserve his right to specific performance, was stated by this court in Wimer v. Wagner, supra, as follows:

"Appellants stress and seek to apply to the vendor the principle that a party to a contract must be free from default in essential particulars, if he would avail himself of a breach committed by the other party—the same rule of which they have run afoul. But that doctrine has reference to claims affirmatively asserted by a complaining obligee, founded on the contract, and not to mere defenses interposed by the obligor in the nature of a bar, absent facts creating a waiver or estoppel. A defendant, though himself delinquent, may thwart the plaintiff's action by showing the latter has not complied with the agreement, although, if the controversy were turned around, and the defendant were complaining, he might be in the same fix. When both parties are in default, neither has a cause of action against the other. [13 C. J., sec. 662, p. 614.]

"The point is made, also, that when the vendor is unable to fulfill his part of the contract by reason of some defect in his title, so that a tender would be wholly nugatory, it is sufficient if the vendee be ready, willing, and able to perform, and a tender is unnecessary. This is true when the vendor openly and unconditionally refuses to perform because of his defective title, and perhaps in other instances, where the conduct of the vendor, voluntary or involuntary, amounts to an anticipatory breach, as where he sells the property to a third person, or is thrown into bankruptcy before the

time for performance. [See 3 Williston on Contracts, secs. 1296-1327, pp. 2345-2378.] But it is not true that the vendee is excused from making a tender merely because he *thinks* (even though correctly) the vendor will be unable to perform within the time stipulated. There must be definite acts or facts convicting the vendor in advance of a breach, and, where, these do not exist, the best and *only way for the vendee to show his ability and readiness* to fulfill his part of the contract *is* for him *to make a tender of performance."* (Our italics.) [For circumstances excusing failure to make tender see note 79 A. L. R. 1240; 25 R. C. L. 321, sec. 136; 58 C. J. 1102, sec. 376; Pomeroy's Specific Performance of Contracts 768, secs. 361-362, p. 813, secs. 382-388.]

Surely in the case of this unilateral option contract, where the optionor's only obligation was to keep the option open for acceptance (by payment in cash of the price stated) until a definite date, the optionee can only show such acceptance (and thus bring into existence a bilateral contract which can be enforced in equity) by *making "a tender of performance."* There was no question of perfecting title in this case (as in the case of real estate contracts); and there was no conduct amounting to anticipatory breach (on the contrary the optionor left the offer open 30 days longer when he learned that plaintiff had been inquiring about it on the last day). There was nothing that Mr. Busch failed to do, except that he did not (prior to the last day) make a mathematical calculation of the amount required to be paid and plaintiff knew approximately what this amount was. It was shown that plaintiff retained other Anheuser-Busch stock and so must have had some information about dividends. Anyhow it is reasonable to find from the evidence that she could have obtained this information (which appears in the record) and that her husband, who was a branch manager for a firm of stock brokers, could have had this calculation accurately made. Although plaintiff had until the last day to make this tender (and with Mr. Busch leaving it open, 30 days longer until May 15, 1931), she did not show any diligence in attempting to get this information before April 16, 1931, and apparently failed to make any attempt to make a calculation from any available sources thereafter. Certainly she could have preserved her right to have specific performance by making a tender within that time based upon calculation from the best available information. [58 C. J., secs. 333 and 343.] Therefore, we must hold that the evidence does not show facts sufficient "to take the case out of the usual rule" requiring tender of performance to show plaintiff's ability (in case of a bilateral contract) or (in the case of these options) plaintiff's acceptance.

But even if we could accept plaintiff's theory that she was prevented by Mr. Busch from making or tendering performance on

April 16, 1931, or prior to May 16, 1931, and was entitled to have a reasonable time thereafter to do so, we would have to hold, under the circumstances shown, that waiting until two years later to make a tender when the stock had trebled in value was an unreasonable delay which was coupled with such a material change of conditions that she could not be entitled to specific performance. The Lane case, which plaintiff cites, based its holding, that a tender of the stock (to be resold) 30 days later "was not an unreasonable time after the expiration of the year," upon the court's finding that "there was no evidence to show that defendant was injured in any way, or that the stock changed in price." "The rule may be laid down as general, applying to either the vendor or the vendee, that where there has been a change of circumstances or relations which render the execution of the contract a hardship to the defendant, and this change grows out of or is accompanied by an unexcused delay on the part of the plaintiff, the change and the delay together will constitute a sufficient ground for denying a specific performance when sought by the one who was thus in default." [Pomeroy, sec. 408; for what amounts to delay for speculative purposes see sec. 407; see, also, 58 C. J. 894, sec. 48, p. 1108-1111, secs. 391-399; Restatement of Contracts, sec. 367; 3 Williston on Contracts, 2544-45, sec. 1425; 25 R. C. L. 250-257, secs. 54-59; O'Fallon v. Kennerly, 45 Mo. 124.] In unilateral contracts, "the party not bound is held to the exercise of extreme diligence and delay is regarded with special strictness." [58 C. J. 1111, sec. 399.] "Promptness in seeking specific performance is especially required in reference to contracts involving the stock of corporations." [25 R. C. L. 252, sec. 55.] "The rule is especially applicable where the purchaser has laid by apparently for the purpose of taking advantage of the change in value." [25 R. C. L. 255, sec. 58.] The denial of specific performance under such circumstances is not based solely upon the same principles involved in the defense of laches or estoppel, because to obtain the remedy of specific performance the plaintiff's conduct must have been fair and equitable, the plaintiff's right thereto must be clear, and the result reached must not be unduly harsh and unfair to defendant, particularly when such result arises out of change in conditions occurring after the time when plaintiff agreed to make performance.

It will be noted that even after Anheuser-Busch stock became active after the election of 1932 and began to sell above $100 per share plaintiff still did nothing but waited several months more until both the United States Congress and the General Assembly of Missouri had authorized the manufacture and sale of beer, and the price went above $150 per share. Furthermore, plaintiff gave Mr. Busch reasonable grounds for belief that she had abandoned all claim to rights of repurchase because, when they had correspondence in June, 1932

(more than a year after the options as extended were terminated), and plaintiff made no assertion that she still claimed the right to purchase the stock or would ever desire to do so. After this correspondence (which concerned only stock in the Borden Company distributed to Anheuser-Busch stockholders), no claim of right or indication of desire to repurchase was made for almost another year and then only after the stock had continuously increased in value for many months. This is not a case of mere lapse of time which could not damage defendants; but it is one which would reward plaintiff for her delay and operate unfairly to defendants by taking from them value which accrued long after expiration of the time within which Mr. Busch contracted to sell. It would surely be inequitable to give to plaintiff (and take away from defendants) three times the value that this stock had at the time when her options expired. Plaintiff's petition states that the reason for her two years delay was "inability to pay." This was an admission that plaintiff was unable to perform her part of the contract as long as the value of the stock remained the same as it was on the date that the extension of her option was terminated; and shows reasonable grounds for belief that she had thereafter abandoned the repurchase options. Certainly it shows that her delay was not entirely due to acts of Mr. Busch, because he did not cause either the depressed value of the stock or the general "conditions in money and security markets" during those two years. We hold that, under the circumstances, tender after two years delay was not performance within a reasonable time of option contracts, to repurchase shares of corporation stock, when time of acceptance by payment is of the essence thereof.

Our conclusions, on plaintiff's own showing, without determining the weight of the evidence against plaintiff's testimony on disputed fact issues, are that the following matters appear, each of which would conclusively bar plaintiff from the right to have a decree of specific performance.

First: Plaintiff had only an option to buy this stock; plaintiff could only show a contract subject to specific performance by showing acceptance within such time as was designated or extended by the optionor; and plaintiff did not show acceptance (in the required manner) within that time.

Second: Even if it could be held that plaintiff was prevented by the optionor from making performance within the time as designated or extended, and was, for that reason, entitled to a reasonable time thereafter to do so, plaintiff did not tender performance within a reasonable time.

The decree is reversed and the cause remanded with directions to dismiss plaintiff's bill. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.

## On Motion for Rehearing.

HYDE, C.—Plaintiff's motion for rehearing is mainly a reargument of questions decided and hence does not comply with our Rule 21. Nevertheless, we have reexamined these questions and concluded that the rulings made are correct. However, we deem it advisable to point out that, in addition to the grounds stated in the opinion for dismissing plaintiff's bill, there is still another reason why plaintiff's bill must be dismissed. ▮▮▮ It is that even if it could be held that tender by plaintiff could be excused, on any ground, plaintiff could not be entitled to specific performance because it appears from her own evidence, as a matter of law, that she never was either ready or able to make performance on April 16, 1931, or at any time between April 16, 1931, and May 16, 1931. Mr. Steinberg testified for plaintiff concerning the dealings he had with her and her husband, as follows:

"I had conversations or negotiations with Mr. Suhre in the spring of 1931, in regard to making a loan to Mrs. Suhre on stock of Anheuser-Busch Company. . . . He said he would like to get about $60,000.00 on the deal. 'It will take about $50,000.00, I imagine, to clean up the loan; naturally, I haven't the exact figures, and Mrs. Suhre and I need some extra money to clean up some other matters.' So I figured that would be about $75.00 per share, and I told him I would make him the loan at $75.00 a share on the 812½ shares of stock for two years, at 6 per cent interest; and I said, 'Now, I know this is not your stock, Will. This is your wife's stock, and I am not going to make a deal with you unless it is with the express understanding that your wife approves of it, and so that I may know it, I want your wife to be here and present when we make the deal.' . . . He brought her down next day, on April 15. . . . I told Mr. and Mrs. Suhre that if Mrs. Suhre was willing to sign the stock or endorse it for a loan, I would make the loan to her at $75.00 per share for two years time, at 6 per cent interest. . . . I did not commit myself as to my being willing over any definite period of time to make the loan. . . . The collateral I had agreed to take for my loan of the money, were the same shares that they sold Mr. August A. Busch, covered by those two option contracts; I knew nothing about option contracts; nor that there were two or one; I only knew it was 812½ shares. . . . I don't recall their having told me anything excepting that they had 812½ shares of Anheuser-Busch stock with Mr. Busch and they owed him approximately $50,000.00, and they wanted to get a little more than that so they could have some money to square up other matters they wished to, and that the whole thing figured about $60,000.00, so I figured it at $75.00 a share. They did tell me that Mr. Busch had refused to extend the time further, so they had to have the money."

Mr. Steinberg further testified that he heard nothing more from them until he met Mr. Suhre in the lobby of an office building and that he then had the following conversation with him:

"I said, 'Say, Will, what kind of business is this? You come up and arrange to make a loan with me, and I tell you I will do it, and I haven't heard anything about it for ten days. What is the delay? What is the matter?' He said that he should have been in to see me but that he heard Mr. Busch had been sick and he had had delay in consummating the taking up of the loan from the Busch end of the matter, on account of Mr. Busch not being there to attend to it."

Plaintiff testified as to this arrangement thus:

"Q. Was there anything said as to how long he would continue to be willing to make you that loan? . . . Was there any discussion as to how long it would be before you would give him an answer on that? A. I said I would probably let him know within a few days. . . . Q. Why didn't you accept the loan from Mr. Steinberg on the occasion when he agreed to loan it to you, when you and Mr. Suhre first went down there, and when you told him that you would let him know in a few days? A. Well, because when we went down there they said Mr. Busch, was at home sick and Mr. Huber couldn't do anything."

Mr. Suhre also testified, as follows:

"Q. Isn't it a fact that the only way in which she could possibly have made the repurchase was to borrow the money on the very same shares of stock covered by those options? . . . That is the only means out of which she could possibly finance the repurchase of those shares of stock? A. Yes, sir. . . . After I found out the amount due, Mr. Steinberg was to send his representative down there with the money and he was to get the stock. . . . When I made the terms with Mr. Steinberg, nothing was mentioned about how long he would keep the money available for Mrs. Suhre's borrowing. Nothing was said on that point at the later conference when Mrs. Suhre accompanied me. It was never brought up. He gave me no writing to commit himself to hold the money for a definite time, and no time was mentioned orally as to how long he would be willing to continue to lend the money. . . . Q. Your expectation was, I assume, that you would be able to arrange so that in some way a conference could be had between Mr. Huber and Mr. Steinberg; where he, Steinberg, would pass over the money to Mr. Huber and Mr. Huber would release the shares so as to be paid for his loan to Mrs. Suhre; is that right? A. Yes, sir."

It is clear from this testimony that neither plaintiff nor her husband ever had the money available to make this re-purchase; nor did they ever have an enforceable legal obligation from anyone to make it available. At most, they had only an offer of a loan, which was

subject to revocation at any time before acceptance. Certainly such an oral offer to make a loan on stock, which plaintiff did not then own, was not the money or its equivalent and did not make plaintiff ready and able to pay the money, when she had signed no note or obligation for it, and had never even definitely agreed to borrow it. The prospective lender was never (before May 16, 1931, when Mr. Steinberg claimed his offer was not open because not accepted within a reasonable time) informed that plaintiff would or did accept his oral offer to lend it, not even on the day (May 15, 1931) when plaintiff and her husband were notified that the options would be finally terminated. In short, while offer was open it was left unaccepted. Certainly plaintiff could not, in this situation, recover damages from Steinberg if he had at any time refused to make the loan. The testimony as to the actual negotiations for the money fails to sustain plaintiff's claim that she had made arrangements by which the money was available so that she was ready and able to perform. Furthermore, Mr. Steinberg was told "nothing about option contracts;" he did not ever offer to furnish money *to tender* to Mr. Busch in performance of the re-purchase options; he only agreed to make a loan on 812½ shares of Anheuser-Busch stock when plaintiff endorsed it for a loan. In any case, whether he would have ever advanced the money to buy the stock was left to speculation and conjecture. That he did not do so or become legally bound to do so is a fact. If plaintiff's negotiations for this loan were left in such condition that Mr. Steinberg had the right to withdraw his offer to make it, how could it be said that plaintiff was ever ready and able to pay the money? "A proposed purchaser is not able, when he is depending upon third parties who are in no way bound to furnish the funds to make the purchase." [Note 1 A. L. R. 528; Reynor v. Mackrill (Iowa), 164 N. W. 335, 1 A. L. R. 523; see, also, 58 C. J. 1065, sec. 316; 25 R. C. L. 336, sec. 158.] As pointed out in Wimer v. Wagner, 323 Mo. 1156, 20 S. W. (2d) 650, even under a bilateral contract there is a great difference between the purchaser's right to defeat the vendor's affirmative action (if the vendor was in default), and the purchaser's right to specific performance (when he is in default himself), because "when both parties are in default, neither has a cause of action against the other." Plaintiff was in that situation upon any view of the case.

The motion for rehearing is overruled. *Ferguson* and *Bradley,* *CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.