The MASONIC TEMPLE ASSOCIATION OF ST. LOUIS, a Corporation, Plaintiff, Respondent,

v.

Donald W. FARRAR et al., As Members of West Gate Lodge No. 445, Ancient Free and Accepted Masons, an Unincorporated Association, and Also as Representatives of the Class to Which They Belong Consisting of All Members of West Gate Lodge No. 445, Ancient Free and Accepted Masons, an Unincorporated Association, Defendants, Appellants.

No. 32505.

St. Louis Court of Appeals.

Missouri.

Sept. 19, 1967.

Rehearing Denied Nov. 30, 1967.

Stemmler & Stemmler, St. Louis, for defendants-appellants.

Clyde H. Snider, Richard O. Rumer, Charles F. Ballak, St. Louis, for plaintiff-respondent.

RUDDY, Judge.

The Masonic Temple Association of St. Louis, a Corporation, (hereinafter referred to as Temple Corporation) brought this action against individually-named defendants, as class representatives of West Gate Lodge No. 445, Ancient Free and Accepted Masons, an unincorporated association, (hereinafter referred to as the Lodge) seeking a decree and judgment declaring that the Lodge does not have the present right to withdraw its membership in the Temple Corporation and does not have the right to terminate the contractual relationship now in existence. The Temple Corporation further sought judgment against the Lodge for an alleged sum due by reason of the contractual relationship. The Temple Corporation was successful in the trial court and the Lodge has appealed from the decree and judgment entered.

The Lodge has a charter from the Grand Lodge of Ancient Free and Accepted Masons of the State of Missouri. The Lodge is subordinate to the Grand Lodge and admittedly acts only under and pursuant to the provisions of its charter. Our examination of the record shows that the Temple Corporation is not subordinate to the Grand Lodge in any respect; the only relationship, with one exception, being a mutual obeisance to each other by reason of both being a part of the Masonic Fraternity. The exception is that the Grand Lodge holds its meetings in the Temple structure for which it is obligated to pay a stipulated sum annually to the Temple Corporation.

The controversy concerns primarily the construction and interpretation of certain documents and certain acts, namely; (1) an instrument denominated Temple Basic Contract; (2) Articles of Agreement for a pro forma incorporation of Temple Corporation and amendment thereof by a decree of Court; (3) By-Laws of the Temple Corporation and amendments thereto, and; (4) acts of the parties to the Temple Basic Contract (to which the Lodge was a party)

subsequent to the incorporation, which acts included the execution of an agreement between the parties referred to in the record as the McKinney Contract. The nature and pertinent provisions of the instruments referred to will be given later.

The Lodge has asserted eleven points, with many sub-points, as errors committed by the trial court. However, all the points may be summed up into two primary contentions. (1) A contention that the submission by the parties of their controversy to the membership of the Ways and Means Committee of the Grand Lodge constituted a submission to a common law arbitration and the unanimous decision of the membership of the Committee in favor of the Lodge is binding and conclusive on the parties. In this same connection it contends if, for any reason, it be held that the determination of the membership of the Ways and Means Committee in favor of the Lodge is not final and conclusive on the parties then the subsequent submission by the parties of the controversy to the membership of the Committee on Jurisprudence of the Grand Lodge constituted a submission to a common law arbitration and the findings of fact and conclusions of that Committee in favor of the Lodge are binding and conclusive on the parties. (2) If it be held by this Court that the controversy between the parties was not finally concluded as aforesaid then it is contended that there was no obligation on the Lodge under the aforementioned instruments and agreements and subsequent acts to continue to pay monthly charges to the Temple Corporation after the Lodge had ceased to hold its meetings in the Temple Building and had notified the Temple Corporation that the Lodge had withdrawn as a member of the Temple Corporation and would make no further payments of monthly charges to it.

The Temple Corporation admits that the Lodge is not obligated to hold its meetings in the Temple Building, but contends that the contractual relationship established by the instruments referred to and the acts of the parties obligates the Lodge to make the payment of monthly charges to the Temple Corporation so long as said Temple structure is used for Masonic purposes only, or until the contractual relationship established by the instruments and the acts is legally terminated. Obviously, if the Lodge is correct in its first primary contention, that there was a binding common law arbitration, there will be no need to discuss the merits of the relative positions taken by the parties as to the second contention.

We now state the pertinent facts and events out of which the controversy arose and the record facts on which the Lodge relies as showing a binding common law arbitration.

In the year 1917 and prior thereto a number of Masonic "Blue Lodges" (of which West Gate Lodge was one), Eastern Star Chapters and other Masonic bodies were holding their meetings in the former Odeon Theatre Building on Grand Avenue in the City of St. Louis as sub-lessees of the Grand Avenue Masonic Temple Association. In the year 1917 representatives of the Lodges, Eastern Star Chapters and other Masonic bodies met for the purpose of discussing the building of a new Masonic Temple. As a result of their meetings an instrument was drafted, referred to in the record as the "Temple Basic Contract," under which the representatives recommended the erection of a Masonic Temple for Masonic purposes only by the several Masonic bodies and Eastern Star Chapters then meeting in the Grand Avenue Masonic Temple and extended the privilege and invitation to other legally constituted and recognized Masonic bodies or Eastern Star Chapters to join in the proposed movement upon the terms and conditions set out in the Temple Basic Contract. This instrument after setting out the methods of financing said Building project contained a provision that " * * * each contributing body shall pay its proportionate share toward the upkeep of said building; the amount to be contributed by each body to be fixed by the board of directors of the proposed Corporation; provided, however,

that each body shall be charged upon a fixed and uniform basis which shall be determined by the privileges accorded such body."

Another provision provided that "No Masonic body or Eastern Star Chapter not a member of the proposed corporation can become tenants in the proposed New Temple, but must become members of the corporation and contribute upon the same basis per capita as other members of the corporation of like class."

The recommended plan further provided that when three-fourths of the Masonic bodies and Eastern Star Chapters then meeting in the Grand Avenue Masonic Temple endorsed the project, each shall appoint representatives for the purpose of organizing a new pro forma decree corporation " * * * pursuant to the law governing the organization of Benevolent, Religious, etc. corporations, * * *." The plan provided that the name of the new corporation shall be "The Masonic Temple Association of St. Louis."

The recommended plan further provided that each body shall be entitled to three representatives in the new corporation and set out the method of electing the board of directors of said corporation. Said recommended plan also provided that "Subject to the above conditions and limitations the Constitution and By-Laws of the proposed corporation shall be such as may be hereafter agreed upon in accordance with the foregoing plan."

The recommended plan received the endorsement of the required three-fourths of the Masonic bodies and Eastern Star Chapters then meeting in the Grand Avenue Masonic Temple. Among the endorsers of the recommended plan was the West Gate Lodge. Following the aforesaid endorsement a pro forma decree of incorporation of the Masonic Temple Association of St. Louis was granted by the Circuit Court of St. Louis on September 15, 1917. The new Masonic Temple was not available for the holding of meetings until November of 1926 when it was opened for meetings of the active members and has been so used ever since.

The purposes given in the Articles of Agreement of the corporation were " * * To finance, locate, erect, build, establish, furnish, equip, maintain and operate a Masonic Temple or Temples to be used for Masonic purposes only by and for the exclusive use of, the several Masonic bodies and Eastern Star Chapters meeting in the City of St. Louis and composing this Association, * * *." The Articles further provided that " * * * all profits or income that may come to the corporation after defraying expenses and paying all the necessary loans, expenses, renewals, and carrying charges and after providing a suitable sinking fund for improvements and additions, shall be applied to the reduction of its rents, charged to the various Masonic bodies and Eastern Star Chapters, in such a manner and proportion as the Association may determine." (This provision in the original Articles of Agreement was amended by court decree on March 18, 1940 to read: " * * * but all income that may come to the corporation after defraying expenses and paying all the necessary loans, expenses, renewals, and carrying charges and after providing a suitable sinking fund for improvements and additions, shall be applied to the reduction of its amortization and maintenance charges charged to the various member bodies, in such manner and proportion as the Association may determine." This amendment merely omitted the word "profits" and in place of "rents" substituted the words "amortization and maintenance charges.") The Articles of Agreement were signed by two representatives of West Gate Lodge No. 445.

The new corporation adopted by-laws which provided for two classes of membership, namely, active and honorary. The by-laws also provided that any legally constituted and recognized Masonic body and Eastern Star Chapter may become an ac-

tive member of the corporation upon terms and conditions named in the by-laws. The by-laws also contained the financial conditions of membership stating the amount of contribution to the building or sinking fund required and the method of payment and provided that each active member shall receive a certificate showing the amount of money contributed by such active member to the building or sinking fund. This certificate represented the proportion of interest of the active member in the assets of the corporation upon dissolution and distribution and was not assignable. The by-laws also contained the following provision: "Section 6. In addition to the foregoing contributions to the Building or Sinking Fund, each active member shall pay its proportionate share toward the *upkeep* of the Temple, the amount to be contributed by each active member to be fixed by the Board of Directors of the Association; provided, however, that each active member shall be charged upon a fixed and uniform basis, which shall be determined by the privileges accorded such active member." In 1931 the above Section 6 was amended by substituting for the word "upkeep" (italicized above) the words "maintenance, interest and amortization of any debt." The by-laws required the Secretary to " * * * attend to the leasing or rental of the halls, collect all rents for same * * *." On January 26, 1925 this provision was amended to read: "He (Secretary) shall, under the direction of the Board of Directors, attend to the letting of the use of the offices; halls, auditoriums, banquet halls, kitchens and other premises of the Association, to the member bodies and shall collect for the use thereof, such sums of money as may be fixed by the Board of Directors."

The representatives of twenty Masonic Lodges (including West Gate) and two Eastern Star Chapters signed the original Articles of Agreement. On December 1, 1960 there were forty-seven active members. The Grand Lodge of Missouri set up its offices and headquarters in the Temple Building and still retains them, for which it pays a stipulated sum annually.

On November 30, 1927 the Lodge received from the Temple Corporation a certificate showing that it had paid to the Temple Corporation Building Fund $31,045. It held its semi-monthly meetings in the Temple building from the time it was opened for meetings to about November, 1960. For this use it paid a monthly per capita charge to the Temple Corporation. For additional meetings it paid $15.00 per meeting.

On March 28, 1925 the Lodge entered into a contract, known as "McKinney Contract," with the Temple Corporation, whereby the Lodge contributed to the building fund of the Temple Corporation an additional $25,000, for which the Temple Corporation agreed to designate and set apart one of the halls in the Temple building to be known and designated as "JOHN E. McKINNEY MEMORIAL HALL." It was also agreed that the Lodge would have the prior right and privilege of using the said hall for holding its meetings and sessions. However, it was understood that this provision would not exempt the Lodge from paying its pro rata share of the maintenance and upkeep of said Temple building.

From the very beginning of its occupancy of the Temple the Lodge disagreed with some of the actions and proposed actions of the Temple Corporation. At times the communications between them were acrimonious, with the Lodge threatening to withdraw its use of the Temple as a meeting place. Some of the matters behind the disagreements we note. In 1926 the Lodge declined to approve a monthly per capita charge established by the Temple Corporation because the Temple Corporation allegedly violated its assurance that the Temple would not be mortgaged and because the Temple Corporation selected the Directors from among the Representatives sent by the Lodge to the Annual Meeting of the Temple Corporation, rather than

permit the Lodge to select its own director for the Board of Directors of the Temple Corporation. In 1930 the Lodge strenuously objected to proposed amendments to the by-laws of the Temple Corporation. These amendments were adopted over the objection of the Lodge. In 1931 and 1933 the per capita charges were reduced by the Temple Corporation. In March of 1958 at one of the board meetings of the Temple Corporation it was proposed to increase the per capita charge of all active members by $2.00 per year beginning January 1, 1959. At this meeting one of the representatives of the Lodge said that West Gate Lodge would not pay any increase in per capita charge. No action was taken on the proposal at that time. However, in October, 1959 the Board of Directors of the Temple Corporation voted to raise $350,000 in capital funds for rehabilitation of the Temple and to increase the per capita charge to provide an additional $30,000 annually. The Lodge informed the Temple Corporation that "West Gate Lodge does not approve and will not participate in the proposed action."

We have not related all the matters that formed the bases of disagreements between the Lodge and the Temple Corporation. It is sufficient to point out that the Lodge consistently opposed any encumbrances on the Temple building and any and all action by the Temple Corporation that would result in increased charges to the active members.

On October 8, 1959 the Lodge wrote the Temple Corporation as follows:

"Having concluded that this Lodge cannot long survive under the conditions the Temple Association now seeks to impose, we plan to withdraw from the Association and arrange to hold our meetings elsewhere.

"However, we want to do so under conditions of full understanding and common consent if that is possible. Therefore we ask the Board of Directors of the Association to consent to our withdrawal from membership and removal of our meeting to some other place as soon as all necessary arrangements can be made."

There was another reason, in addition to the above disagreements, causing the Lodge to withdraw from the Temple Corporation and arrange to hold its meetings elsewhere. There was a decline in membership and a change in the residential complexion of the membership of the Lodge. The record shows that in 1917 96.72% of its membership lived in the City of St. Louis. At approximately the time the above letter was sent 28.57% lived in the City of St. Louis and 71.43% lived in the County of St. Louis. It seemed that the Lodge considered it more convenient to its membership to find a meeting place in the County, which it did. In addition it felt it should not pay the increased per capita charge.

In a letter dated January 6, 1960 the Temple Corporation informed the Lodge that at a regular meeting of the Board of Directors of the Temple Corporation the application of the Lodge " * * * for withdrawal from the Association and from membership therein * * * " was denied. Many discussions took place between the membership and officers of the Lodge with the President of the Temple Corporation in an effort to resolve the differences. The Temple Corporation finally informed the Lodge that it could move if it so desired but that it would have to continue paying " * * * the per capita charge for maintenance and amortization to Temple Corporation." On September 20, 1960 the Lodge adopted a resolution authorizing its officers " * * * to complete all necessary arrangements for, and to accomplish the removal of the meeting place of the Lodge to Brentwood Masonic Lodge Hall in Brentwood, Mo., and further to withdraw West Gate Lodge from membership in the Masonic Temple Association and to terminate the status of the Lodge as a member body therein." On October 18, 1960 the

Lodge held its last meeting in the Temple building. All of its meetings since then have been held in the Brentwood Masonic Lodge Building in Brentwood, Missouri. On November 15, 1960 the Lodge sent to the Temple Corporation its check in the sum of $191.75, stating in an accompanying letter " * * * this payment is our last act as an Active Member Body of the Masonic Temple Association of St. Louis, Mo. and will terminate our status as such." On November 18, 1960 the Temple Corporation acknowledged receipt of the check and, inter alia, informed the Lodge as follows: " * * * Of course, you will receive notice at the proper time of your maintenance payment for December and for subsequent months. Our Association cannot recognize the unilateral right of your Lodge or any other member of our Association to terminate its status. * * * " The Temple Corporation continued to send monthly bills to the Lodge after the Lodge discontinued its meetings in the Temple building.

In the early history of the Lodge's opposition to the actions of the Temple Corporation it sought advice from the Grand Master of the Grand Lodge on its differences with the Temple Corporation. In its communication with the Grand Master the Lodge sought his advice on five questions concerning actions of the Temple Corporation which it opposed. The Grand Master referred the five questions to the Committee on Jurisprudence of the Grand Lodge. This Committee reported to the Grand Master that "Your Committee feels that it has no jurisdiction whatsoever in this matter and that neither has the Grand Lodge, and we therefore respectfully recommend that the complaint of the above-mentioned Lodge be dismissed." However, in a letter to the Secretary of the Lodge the Grand Master did attempt to answer the questions posed to him.

After the Lodge determined to withdraw from the Temple Corporation the impasse that had been reached between the parties found its way somehow into the hands of the Grand Master of the Grand Lodge for solution. It is not clear in the record who first sought his assistance. However, the Lodge contends that the Temple Corporation presented the controversy to the Grand Lodge urging that the Grand Master should somehow interpose on the side of the Temple Corporation. Support for this contention of the Lodge may be found in a report of the Committee on Jurisprudence of the Grand Lodge, which report we will later discuss, wherein the Committee when referring to the controversy said,

"Officers of the Grand Lodge were put to considering the contrariety of these contentions; due to insistence emanating from or on behalf of the Temple Association. The urgings were to the effect that the Grand Master (or, in other words, the Grand Lodge) somehow should interpose, on the side of the Temple Association. * * * "

On October 23, 1960 the Grand Master in a letter addressed to the President of the Temple Corporation and to the Worshipful Master of West Gate Lodge informed them, "I have been informed that a controversy has developed between the new Masonic Temple Association of St. Louis and West Gate Lodge No. 445 to the extent that legal action is being contemplated or threatened by one or both parties." He called attention to Section 5.080 of the Grand Lodge By-Laws relating to settlement of disputes between Lodges and Building Associations and requested utilization of this provision of the By-Laws by the parties.

We point out here that Section 5.101 of the By-Laws of the Grand Lodge provided for standing committees appointed by the Grand Master, among such committees being a Committee on Ways and Means and a Committee on Jurisprudence, composed of lawyers.

Section 5.080 of the By-Laws of the Grand Lodge (referred to above) provided that, among other matters, the Committee

on Ways and Means upon request of the Grand Master, makes adjustments on all disputes between the Lodge and Building Associations.

Section 5.070 of the By-Laws of the Grand Lodge provided that the Committee On Jurisprudence has referred to it, among other matters, legal questions as directed by the Grand Master or the Grand Lodge.

The record indicates that on November 21, 1960 the controversy between the Temple Corporation and the Lodge was referred by direction of the Grand Master, "acting on his own motion," to the Committee on Ways and Means " * * * under the provisions of Section 5.080 of the Grand Lodge By-Laws." On the same date the Grand Master wrote to the Temple Corporation that he had directed the Ways and Means Committee to take charge of the dispute.

On November 23, 1960 the President of the Temple Corporation wrote the Grand Master stating, among other things, the following:

" * * * On behalf of the Masonic Temple Association of St. Louis I shall be glad to co-operate in every way in the presentation of this matter before the Ways and Means Committee of the Grand Lodge, and hope that it can give attention to our situation at an early date. May I respectfully suggest that the Committee should be authorized to hold a meeting in order to hear the respective contentions that may be presented to it, and not be confined to handling its assignment wholly by correspondence. * * *

"While wanting to co-operate and to expedite the disposition of this matter, I should like to say that I remain of the opinion that our problem with West Gate Lodge is not of the type contemplated for handling by the Ways and Means Committee of the Grand Lodge under Section 5.080 for the following reasons: * * *."

Among the reasons given was that the Committee could only make adjustment in disputes concerning financial conditions of the Lodge and of disputes between the Lodge and Building Associations. The Temple Corporation pointed out that the dispute was not a financial one but was a matter of interpretation of a contract. A further reason given was that the Temple Corporation, while it operates a building, " * * * is not a building association within the meaning of that term as used in the Grand Lodge By-Laws." The letter concluded as follows:

"However, as stated at the outset of this letter, we shall co-operate in every way in appearing before the Ways and Means Committee and its legal counsel, if it selects counsel. We shall eagerly await a communication from the Chairman of the Ways and Means Committee."

On February 18, 1961 the Ways and Means Committee met and the Chairman presented to the representatives of the contending parties Orestes Mitchell, who had been retained by the Committee as Counsel. Representing the Temple Corporation were its President, a very competent attorney and an esteemed member of the Judiciary, its secretary, and five members of the Executive Committee and Board of Directors, some of whom were competent attorneys. The Lodge was represented by some of its officers and members.

In stating the issues for determination the Chairman said:

"The primary question is: Has West Gate Lodge the right to move from the Temple and thereafter be freed from future contributions as a pro rata share of the cost of maintenance and support of the Temple?

"The secondary question is: Should it be found that West Gate Lodge No. 445 has moved from the Temple, does said Lodge still have obligation to contribute, pro rata, to the support and maintenance of the Temple.

"Should it be found that such obligation exists, when does it terminate?"

A record of the proceedings was kept by a reporter who recorded all statements made. Introduced as a part of the record were certified copies of the Articles of Agreement, the original By-Laws and Amendments.

No order of presentation was made by the Chairman and the first to present its case was the Temple Corporation. Its President announced that he was its spokesman. He started by attempting to clarify the determination to be made by the Committee. He said:

"* * * I think the question is, 'Can a Lodge by its own action terminate its obligations to the seventeen other Lodges and the * * * thirty other bodies besides these seventeen Lodges with which it has jointly undertaken a project?' It can move. I will say at the outset there is no question it can move, so I do not consider that a question before this body. But can it by its own action terminate its obligations?"

The substance of the presentation for the Temple Corporation was that the Temple Basic Contract, the corporation's Articles of Agreement and By-Laws and amendments thereto was a joint venture creating a legal relationship by which the active member "* * * bodies bound themselves to each other jointly to build and to maintain and to operate * * *" the Temple; that no active member had the right to withdraw as long as the Temple was being used for Masonic purposes only. As said by the President of the Temple Corporation: "* * * This joint venture does not end until the purpose for which it was established has been completed or is impossible." The President cited Appellate Court decisions of this state in support of the contention of the Temple Corporation and excerpts from these decisions were read to the Committee. He said that the legal relationship imposed an obligation on the Lodge to pay "* * * 'its proportionate

share towards the maintenance, interest and amortization of any debt of the Temple' * * * *" and therefore it was obligated to pay the monthly per capita charge. He said there was no provision in the instruments relied on for withdrawal by any active member from the Association, even though the member did not meet in the Temple.

The President gave the Committee another reason in support of the contention of the Temple Corporation. He pointed out that there were forty-eight active member bodies in the Temple Corporation and that if the Committee's decision and determination was in favor of the West Gate Lodge and absolved it of payment of its per capita charge, then one or more other active member bodies, by unilateral action, could withdraw at will and leave the burden of maintaining the Temple to a smaller number of members. He said,

"* * * We are only concerned with the grave necessity of preserving Freemasonry in this City. We know if one body leaves—I mean by 'leaves' that it fails to make its contribution—they can meet any place they wish—if one can shed itself of its obligations, so can a second and a third and then you would have destroyed the Temple, because it can not be carried on by a few."

He said that the Temple "* * * would soon become practically an empty building. That would be destructive of the status of Freemasonry in this City."

In the course of his presentation of the issue before the Committee the President of the Temple Corporation said: "* * * We promised our cooperation and we are going to give our cooperation, but we cannot refrain from telling you what this issue is as we view it. It is a big issue, and an underlying issue."

In the concluding part of his presentation the President said:

"We are so certain of the right of our position that we are prepared to institute

a declaratory judgment action to determine what the rights and obligations of the Temple Association, the forty-seven member bodies are. It may have been better if we had known before we persuaded people to contribute $100,000 to this campaign, thus far received and pledged—eighty-odd thousand worth in hand and the balance in pledges, but the Grand Master wanted to exhaust every possibility of disposing of it within the Fraternity, and that we can't quarrel with. It is much preferable to do it this way."

Another respresentative of the Temple Corporation who is a competent and highly respected attorney, said:

" * * * Mister Chairman, may I bring this thing back into focus? The question we are trying to determine is what are the obligations of West Gate Lodge under its commitment to this Temple Association, to participate in the erection, financing and maintenance of this Association. That is the question that is for determination summarily, and it can be determined. There was an inclination to have it determined by legal proceedings. When I found that out I urged strongly that it be avoided, because within our Fraternity we ought to be able to settle our own affairs. We ought to be able to determine these things ourselves.

"Once having determined the obligations of West Gate Lodge then it becomes the function of the Grand Lodge, and then only, to enforce that obligation and to see that obligation is enforced by such means as the Grand Lodge has.

"When we get into these extraneous things we are going to lose sight of the main question. I would like to bring us back to that one main question, which is a question of right and liability according to law. I believe that puts the burden on your counsel. I don't know why the Committee felt it needed the assistance of an expert, but it got one. There is

the question to be determined. That is the question that the Temple Association would like to have determined according to law and not according to emotional disputes on extraneous subject matters that you have so patiently listened to, some on our part and some on the other side."

The essence of the presentation for the Lodge was that continued active membership in the Temple Corporation would bring about the destruction of the Lodge, the representative of the Lodge pointing out that its membership at the time of the hearing was less than half the total membership at the time it began meeting in the Temple; that the fact that the Lodge had stayed in the Temple has caused the loss of membership and its meeting in the Temple was a very important factor, if not the principal cause of loss of membership; that the officers were trying to save the Lodge and that it could not be done in the Temple Corporation. The Lodge representatives pointed out that the survival of the Temple Corporation did not depend upon the number of Lodges meeting in the Temple, that it depended upon the number of individual members belonging to the Lodges, which determines the per capita income. The Lodge representatives said that " * * * we did employ what we believe to be a competent attorney, who has long experience and long knowledge in Masonic affairs, too. His opinion was that we were within our rights in asking to withdraw." Again they said " * * * The preponderance of legal opinion to which this matter has been exposed is definitely to the effect that West Gate Lodge has acted within its rights, * * *." At the conclusion of the hearing the Chairman of the Committee said, " * * * Frankly I think that the Committee has quite a little problem ahead of them in arriving at some sort of decision, but we will try to review the evidence that has been presented on these various items and come, under the guidance of our very capable counsel, come to a proper decision with fairness to all."

Briefs were filed by the parties and thereafter a report of the findings and determination of the Committee was made and forwarded to the Grand Master of the Grand Lodge of the State of Missouri. In its report the Committee discussed some of the legal citations given to the Committee by the Temple Corporation in support of its contention that the legal relationship of the Lodge to the Temple Corporation was one of joint venture. The Committee said: "Even if this could be considered in law as a joint venture, which we do not find, we do not see how a Lodge could be bound to a continuing and perpetual contract." The Committee then made the following findings and determination:

"We find nothing in the documents at hand that establishes a written contract or agreement binding West Gate Lodge in perpetuity to contribute to the support and maintenance of the Temple after it has moved its meeting place from the building, nor do we think such an obligation can be implied from the by-laws or the articles of agreement of the Temple Association. It is the conclusion of the committee that when West Gate Lodge #445 moved from the Temple it ceased to be an active member of the Association, and that it was not thereafter obligated to contribute pro rata to the support and maintenance of the Temple."

On May 9, 1961 the Grand Master wrote to the President of the Temple Corporation and to the Lodge as follows: "I am in receipt of the report of the final action of the Ways and Means Committee determining the controversy between the Masonic Temple Association of St. Louis and West Gate Lodge, No. 445, A.F. & A.M. A copy of their report is enclosed."

It appears that at the next Annual Meeting of the Grand Lodge this report, findings and conclusions of the Ways and Means Committee was discussed. One of the representatives of the Temple Corporation, who had participated in the hearing before the Ways and Means Committee

and who was an attorney and another member present who is an eminent attorney and a distinguished citizen, but not a member of a Lodge meeting in the Temple building, stated that the conclusions of the Ways and Means Committee and their disposition of the case should be subjected to a review by the Jurisprudence Committee of the Grand Lodge. After paying homage to the industry, integrity and competence of the Ways and Means Committee they suggested that the Jurisprudence Committee, composed entirely of lawyers, would be more competent to consider the dispute because, as they said, it presented "a legal question." Thereupon the matter in controversy was referred to the Committee on Jurisprudence. Subsequently, the Committee on Jurisprudence met and there appeared before said Committee some of the same representatives for the Temple Corporation and the Lodge that had appeared before the Ways and Means Committee. In addition there were other representatives present of the respective parties. All of the documents, other evidence and a record of all of the proceedings that took place at the hearing before the Ways and Means Committee were made a part of the record for the Jurisprudence Committee to consider.

Additional evidence was presented by the President of the Temple Corporation. This consisted of readings of minutes of pre-incorporation proceedings and some of the subsequent corporation proceedings. The President of the Temple Corporation in his argument urged the membership of the Jurisprudence Committee not to feel bound by the report of the Ways and Means Committee, pointing out that that Committee was a Committee of laymen and not of lawyers. He said,

"Now, at last, in this Committee, the Jurisprudence Committee, composed of lawyers, we have the right body that can pass on the legal issue. You Brethren are very much in the position of a court. We are hopeful we will not have to go to Court. We are hopeful that the lawyers sitting here as judges on what is

more a law issue than a fact issue, will make the determination that makes it unnecessary that we go to Court."

The President stated that the issue was strictly a matter of the meaning of a contract and he again cited and read excerpts from Missouri decisions and legal textbooks relying on the legal concept of joint venture. However, the President in his concluding argument pointed out that a decision adverse to the Temple Corporation could mean the loss of a valuable building and would be ruinous to the cause of Masonic fraternity in this area. The argument of the representative of the Lodge was in essence similar to that presented to the Ways and Means Committee and pointed out that while that Committee was composed of laymen it did have competent legal counsel as its advisor. Briefs were filed by the contending parties and a considerable portion of the brief of the Temple Corporation was devoted to upholding the competency and jurisdiction of the Jurisprudence Committee to hear the dispute. We quote some statements from its brief which show a complete submission of the dispute by the Temple Corporation to the Jurisprudence Committee:

"West Gate contends this Jurisprudence Committee has NO jurisdiction over any question of civil law; and that the jurisdiction of said Committee does NOT extend beyond questions of Masonic law.

\*　　\*　　\*　　\*　　\*　　\*

"The exercise of this natural right by reference to the Jurisprudence Committee of a matter involving civil law questions is justified in reason by the fact that such committee is composed of experienced lawyers.

\*　　\*　　\*　　\*　　\*　　\*

"In summary, the Jurisprudence Committee has jurisdiction of the whole matter, including ALL legal questions \* \* \*."

The Jurisprudence Committee made its report. The parts of the report we think pertinent to the contention raised by the Lodge that the Temple Corporation submitted to a common law arbitration, we quote as follows:

"Officers of the Grand Lodge were put to considering the contrariety of these contentions; due to insistence emanating from or on behalf of the Temple Association. The urgings were to the effect that the Grand Master (or, in other words, the Grand Lodge) somehow should interpose, on the side of the Temple Association. \* \* \*

\*　　\*　　\*　　\*　　\*　　\*

"This Committee in due course arranged for and held a hearing, at which each of the parties could and did submit evidence in oral argument; and, since then, we have been further advised on their various points and authorities, through an extensive series of written briefs, furnished by respected counsel. All of the information thus afforded, of course, has been examined and taken into consideration.

"The conclusions which we have reached, and the disposition of the matter which we recommend, are set forth below."

(There follows a discussion "as to what already has been transpired" and "as to 'interest of the Craft as a whole'. \* \* \*") Then the following:

"3. As to what should be done:

"Neither historically nor inherently have we found basis for thinking that the field of Masonic authority is, or ought to be, extensive enough to include functioning, in lieu of a court of law, to determine rights or liabilities in contractual matters; *unless the functioning is in or pursuant to some arbitration arrangement.* (Emphasis ours)

"Therefore, our premise is that what heretofore has been pointed out with

reference to the conclusion of the Ways and Means Committee of last year would be of equal applicability with reference to any submitted conclusion of the present committee, as to merit or lack of merit, as the case may be, in the Temple Association contention of Lodge-liability.

"Yet, the present committee has considered the Temple Association's contention.

"All submitted factual data with reference thereto has been studied; ·including not only the consummated corporate set-up of the Temple Association, but also what transpired in advance, or separately, and allegedly not merged therein. The arguments in applicability of principles of ordinary law have been considered, too. The results are:

"1. Regarding the allegedly separate aspects of the pre-incorporation period (sometimes called 'joint adventure,' 'trust', or howsoever described) our judgment would be that nothing therein constitutes, or evidences, any Lodge-obligation remaining effective after, and apart from, whatever exists in and by reason of the corporate set-up of the Temple Association.

"2. Regarding the corporate set-up, as such, the conclusion which we would reach is that, a specifically restrictive agreement not having been embodied therein, the principle of the law is applicable which permits a withdrawal by a member at will (that is unilaterally) terminating the membership-status for all purposes, present or future; and that, with such a termination of membership-status, when and if accomplished, there would be no liability remaining on the part of the former member to pay on account of upkeep in any subsequently accruing period.

"Those are views unanimously reached by the members of this Committee; * *.

\* \* \* \* \* \*

"In conclusion. Regardless of whether the course of action of the Lodge may be deemed to have been proper or however much (if any) the assertions of the Temple Association may seem just, the Grand Lodge should divest itself of the matter, in this instance.

"The result in the Grand Lodge which we recommend is (a) that nothing contractually determinative for any disputant in the controversy here involved results from either adoption of the present committee's report, or any other step which in the course of these recent years has transpired within or attributable to the Grand Lodge; and (b) that Grand Lodge's concern with reference to the controversy hereby ends."

At the next Annual Meeting of the Grand Lodge held in 1962 the Report of the Committee on Jurisprudence was read and a motion was made for its adoption and thereupon there was a motion by one of the representatives of the Temple Corporation, who had participated in both Committee hearings, to strike from the Report all findings of fact and conclusions of law made by the Committee, wherein it absolved West Gate Lodge of liability from further payment of per capita charges after removal from the Temple Building. The motion to strike was submitted to the body and was lost. Thereafter, the entire Report of the Committee was adopted by the Grand Lodge.

The record shows no further proceedings relating to the controversy were held in the Grand Lodge.

We have narrated rather extensively the evidence showing the origin, nature and ultimate issue of the controversy that developed between the Lodge and the Temple Corporation and we have shown the statements of the representatives of the Temple Corporation and others on which the Lodge relies in support of its contention that the Temple Corporation's participation in the hearings before the respective Committees constituted a submission of the controversy

to a common law arbitration and that the decision of either one or both Committees is binding and conclusive on the parties. We now proceed to examine the law and apply it to the aforesaid evidence.

At the threshold of our discussion we point out that we do not consider the Temple Corporation's participation in the hearings and submission of the controversy to the Committees as proceedings, wherein the Constitution or By-Laws compel members to resort to a prescribed method of procedure within an organization before invoking the aid of courts. The record shows that the Temple Corporation was not subordinate to the Grand Lodge or its Constitution and By-Laws. As far as we can ascertain from the record the Grand Lodge had no jurisdiction to compel the Temple Corporation to resort to the procedure that was followed. The Temple Corporation was not compelled to submit the controversy to either Committee. It could have refused to participate in the hearings and filed the instant action without the consent or approval of the Grand Lodge. This it did not do, but rather sought the assistance of the Grand Master to settle the controversy. So, we proceed, with the understanding that the Temple Corporation was not under compulsion to exhaust remedies within the Grand Lodge.

■ Arbitrations are favored and encouraged by the courts, since the object is to obtain such a settlement as will put an end to the dispute and conclude the matter submitted. Every reasonable intendment is indulged in favor of an arbitration award. Courts construe the arbitration proceedings with liberality, on the theory that justice may on occasions be promoted by the submission of a dispute to a domestic tribunal created by the parties themselves, which, not being bound by rules of evidence, can consider facts that a court could not regard. Fernandes Grain Co. v. Hunter, 217 Mo. App. 187, 274 S.W. 901.

■ In Missouri the right of disputants to agree to a common law arbitration

is recognized. There are statutory provisions in Missouri for arbitration, (Sections 435.010 et seq. RSMo 1959, V.A.M.S.) however, the statutory and common law methods of arbitration are regarded in this state as concurrent remedies and, therefore, we need not determine if the Lodge was correct in asserting a common law arbitration. Fleming v. KCKN Broadcasting Co., 241 Mo.App. 148, 233 S.W.2d 815; Thatcher Implement & Mercantile Co. v. Brubaker, 193 Mo.App. 627, 187 S.W. 117.

■ An arbitration award, regular on its face, not the result of fraud or collusion, finally concludes and binds the parties on the merits of all matters properly within the scope of the award, both as to law and facts, and the courts will have no inquiry as to whether the determination thereon was right or wrong, for the purpose of interfering with the award. Higgins-Wall-Dyer Co. v. City of St. Louis, 331 Mo. 454, 53 S.W.2d 864, 866; Fernandes Grain Co. v. Hunter, supra; 6 C.J.S. Arbitration and Award § 95, pp. 240 and 241.

■ There can be no doubt that the Lodge can set up the award, if valid, as a bar to the action of the Temple Corporation. 6 C.J.S. Arbitration and Award § 126, p. 275. In this connection the Lodge has the burden of proving a submission and award which are valid on their face. Thatcher Implement & Mercantile Co. v. Brubaker, supra, 6 C.J.S. Arbitration and Award §§ 7, 130, pp. 156, 281.

■ Disputes involving questions of law may be submitted to arbitration. The submission by the parties of their dispute is the foundation of the arbitrators' jurisdiction. The submission furnishes the source and prescribes the limits of the arbitrators' authority and a failure to prove the agreement for submission would be fatal to the Lodge's reliance on the determination and award. Thatcher Implement & Mercantile Co. v. Brubaker, supra. But, it has been held, that participation in the arbitration proceeding is of itself evidence of the par-

ty's prior agreement to submit. 6 C.J.S. Arbitration and Award § 7, p. 156. Permitting the arbitration hearing to proceed is a tacit agreement to arbitrate the controversy. In the case of Fernandes Grain Co. v. Hunter, 217 Mo.App. 187, 274 S.W. 901, l. c. 904, the court said: "* * * The courts have always held that one who resorts to arbitration, is present at the hearing, and participates in everything that is done, will not be heard to complain of any irregularity when the award goes against him. * * *" If the ordinary elements of a contract are present it is usually sufficient to show a submission if it appears *from the acts of the parties* that they intended to arbitrate, and that the decision of the arbitrators should have the effect of an award. 6 C.J.S. Arbitration and Award § 14, p. 160. When there has been a valid submission and award the law implies an agreement to abide by the award. Wabash Ry. Co. v. American Refrigerator Transit Co., 8 Cir., 7 F.2d 335, 351, 6 C.J.S. Arbitration and Award § 24, p. 164.

Mindful of the aforesaid norms, rules and principles of law we cannot escape the conclusion, when they are applied to the evidence we have shown from the record, that the Temple Corporation voluntarily submitted its controversy with the Lodge to the two Committees, which it was not under any compulsion to do, with the intent and purpose of having the Committees hear and determine the controversy. Frankly, under the circumstances of the parties, there could be no other purpose. By doing so it entered into common law arbitrations. We think the evidence fully justifies our conclusion. A brief résumé of the actions of the Temple Corporation demonstrates what we have said.

We start with the reminder that there was no obligation on the part of the Temple Corporation to participate in or submit to the Committee hearings. However, the truth is, the Temple Corporation initiated the move for some method of settling the dispute by seeking the intercession of the

Grand Master in its behalf. The Grand Master, no doubt with the knowledge that earlier the Jurisprudence Committee had held that the Grand Lodge had no jurisdiction of the dispute, with the request of the Temple Corporation in hand, referred the dispute to a group (the Ways and Means Committee) he thought could determine who was right and who was wrong in the controversy. The Grand Master wrote to the Temple Corporation advising it of his referral of the dispute to the Ways and Means Committee. The President of the Temple Corporation in answer to the communication of the Grand Master told him the Temple Corporation was not a building association within the meaning of the Grand Lodge By-Laws, thereby holding the Grand Lodge had no jurisdiction over it, but, nevertheless, agreeing to cooperate in every way in the submission of the dispute to this Committee. The President and other competent representatives appeared in behalf of the Temple Corporation. The President clarified the issues *for determination* by the Committee. Evidence was presented, arguments were made and legal authorities were presented to the Committee by the representatives of the Temple Corporation. Matters other than legal questions were presented for consideration by the Committee. Again, in his presentation, the President of the Temple Corporation promised cooperation in the hearing. While stating that the Temple Corporation had prepared to institute a declaratory judgment action in the matter, he concluded with telling the Committee that it was "preferable to do it this way", meaning a hearing and disposition of the matter within the Masonic Fraternity. Another representative in his argument in behalf of the Temple Corporation said that he was opposed to legal procedure and declared "we ought to be able to settle our own affairs" and said that the dispute "can be determined" by the Committee. He said that the principal question for determination was a legal one and concluded by saying "* * * that is the question that the Temple Corporation would like to have de-

termined * * *." Finally, a brief was filed by the Temple Corporation in behalf of its position in the dispute. The above shows clearly that the Temple Corporation did not object to the proceeding; that instead, it participated fully and completely in what we find was an arbitration proceeding, with the declared purpose as said by the representatives of the Temple Corporation to determine the dispute and especially the legal liability of the Lodge for the payment of future per capita charges. The report of the Committee determined the dispute and controversy adversely to the Temple Corporation. The Grand Master in his letter to the Temple Corporation said that the action was final and that the report of the Committee determined the controversy between the parties. There was no response by the Temple Corporation to the communication of the Grand Master declaring that the controversy had been finally determined.

We think the proceeding as shown constituted a common law arbitration and that the determination or award of the Committee is binding and conclusive on the parties and, therefore, because the determination was adverse to the Temple Corporation it is a bar to the instant declaratory judgment action by it. As heretofore shown when there has been a valid submission and award the law implies an agreement to abide by the award.

■ Unfortunately, at the Annual Communication (Meeting) of the Grand Lodge the determination of the Committee somehow was brought into discussion. We agree with the Lodge in its statement that the matter should have been permitted to rest and should not have been brought up for discussion, because it was not a matter within the jurisdiction of the Grand Lodge to either approve or adopt the report of the Committee. Nevertheless, at the urging of one of the representatives of the Temple Corporation, who had appeared in the hearing before the Ways and Means Committee, the controversy was referred to the Juris-

prudence Committee for hearing and determination. The representative of the Temple Corporation urged this hearing before the Jurisprudence Committee because the Committee was composed entirely of lawyers.

The representatives of the Temple Corporation appeared before the Jurisprudence Committee and presented the same evidence and argument presented to the Ways and Means Committee. Additional evidence was presented by the Temple Corporation. Legal authorities were cited. The President of the Temple Corporation expressed the hope and desire " * * * *that the lawyers sitting here as judges—will make the determination * * *." The brief filed by the Temple Corporation shows full participation by it in the hearing and a complete submission of the controversy to the Committee for determination. This Committee found adversely to the contention of the Temple Corporation. Its determination and award shows that the Temple Corporation sought the intercession of the Grand Master. The hearing was not a Grand Lodge proceeding. The Committee understood this as noted in its report and award. The Temple Corporation representatives knew it, having asserted it was not a building association within the terms of the Grand Lodge By-Laws and, therefore, it was not subject to the jurisdiction of the Grand Lodge. Here again the proceeding was a common law arbitration and determination of the controversy.

The Temple Corporation contends that it did not agree to the referral of the controversy to either Committee; nor did it agree to a submission of the controversy to either Committee. The fact is the record shows that the Temple Corporation agreed in writing to a hearing before the Ways and Means Committee. The President of the Temple Corporation in his letter to the Grand Master pledged his full cooperation in such a hearing. In connection with the hearing before the Jurisprudence Committee it requested and urged a hearing before this Committee, because it was composed entirely of lawyers. In addition, as we have

pointed out heretofore, the law holds that participation in the proceeding is of itself evidence of the party's prior agreement to submit the matter to arbitration and permitting the hearing to proceed is a tacit agreement to arbitrate the controversy. Also, it clearly appears from the statements, conduct and acts of the Temple Corporation representatives that it intended to arbitrate and that the decision of the arbitrators should have the effect of an award.

The Temple Corporation also contends that it was not its purpose to be bound by any determination of either Committee and that it did not intend to arbitrate the dispute. We ask, "What was its purpose?" if it was not to determine the controversy. If a binding determination was not its purpose then the hearings were useless. The statements made during the two hearings by the representatives of the Temple Corporation indicate clearly that they were expecting a determination of the controversy through the medium of the hearings and as they said they considered it much more preferable to do it this way, "within the fraternity," than resorting to courts of law.

Finally, the Temple Corporation seems to contend that the Jurisprudence Committee denied it had jurisdiction to bind the parties by its determination because in the concluding part of its report and determination it recommended that the Grand Lodge divest itself of the controversy and so far as the Grand Lodge was concerned that it not determine the contractual liability of the disputants.

We do not understand the Committee to hold that its determination was not binding on the parties. It is true it recommended that "the Grand Lodge" divest itself of the matter and that "the Grand Lodge" make no determination of the contractual liability of any disputant. This was wise counsel, because the Committee found that neither historically nor inherently was there authority in the Grand Lodge for determin-

ing the contractual dispute between the parties, inasmuch as the Temple Corporation was not under its jurisdiction. The Committee knew the Grand Lodge had no binding authority in this matter over the Temple Corporation. The Jurisprudence Committee had so held in a previous inquiry by the Grand Master. The proceeding was not an effort on the part of either disputant to exhaust remedies within the Grand Lodge and the Committee so held, and, therefore, made the aforementioned recommendation to the Grand Lodge. The Committee after recommending "hands off" by the Grand Lodge, then indicated its function was "in or pursuant to some arbitration arrangement." It thus correctly analyzed and determined its function and jurisdiction. As an arbitration committee it "considered the Temple Association's contentions." The result of its consideration of the contentions was a determination and award adverse to the Temple Corporation. This determination and award of the Arbitration Committee is binding on the parties and the recommendation made by it to the Grand Lodge in no way affects the binding nature of its determination. We add, that after the Committee determined its status and function and made its determination, any words used after this purpose was accomplished may be regarded as surplusage. The two Committees acted as common law committees of arbitration, did so act and was made such a committee by the actions, agreements, participation and submission by the parties themselves in and to the proceedings. No doubt the Temple Corporation submitted the matter confident of a favorable result, "* * * 'But he who submits to arbitration takes his chances, and those who pass upon the controversy are the sole judges of the law and the facts, and their action, unless manifestly fraudulent, cannot be reviewed by the courts.'" Fernandes Grain Co. v. Hunter, supra, 217 Mo.App. l. c. 906, 274 S.W. 906.

 The trial court in a memorandum opinion found there was no common

law arbitration because the Temple Corporation did not expressly agree to arbitration. Of course as we pointed out there need not be an express agreement to arbitrate. The parties are deemed to have impliedly agreed to arbitration if they participated and submitted their controversy to the Committee for determination. As we said before, otherwise what purpose, other than arbitration, was to be served by the hearing. Also, the trial court in its memorandum opinion indicated that the determination and award may be impeached for mistake. However, the trial court failed to indicate what evidence pointed to the existence of a mistake in the submission or determination of the controversy. There is no doubt that fraud, collusion, or mistake resulting in an injustice to either party will invalidate the award. Fernandes Grain Co. v. Hunter, supra; Wabash Ry. Co. v. American Refrigerator Transit Co., 8 Cir., 7 F.2d 335, 351. We find no evidence of fraud, collusion or mistake.

◼ In conclusion we express the feeling that when a controversy of this nature or of any kind arises between persons or groups who are linked together in common ties of fraternity and pledged to the same objectives, resort should be had to arbitration, where facts may be considered, that a court bound by the strict rules of evidence, would reject. What we have said makes it unnecessary to discuss the second contention raised by the Lodge.

We hold that the declaration, judgment and decree of the trial court should be reversed and set aside and the cause should be remanded with directions to enter a new declaration, judgment and decree in favor of the defendants and against the plaintiff in accordance with the views expressed herein. It is so ordered.

ANDERSON, P. J., and WOLFE, J., concur.

On Motion for Rehearing

PER CURIAM.

◼ In its Motion for Rehearing, consisting of forty-one pages, the Temple Corporation has included much reargument of the issue determined in the opinion and presented some new propositions and complaints not made in its original brief and raised for the first time in its Motion for Rehearing. These matters are not in compliance with Civil Rule 83.16 V.A.M.R. and will be disregarded. Ackerman v. Globe-Democrat Pub. Co., Mo., 368 S.W.2d 469, Suhre v. Busch, 343 Mo. 170, 120 S.W.2d 47.

◼ The Temple Corporation contends that we overlooked the fact that the lodge was under compulsion as a subordinate of the Grand Lodge to participate in both hearings and that the Temple Corporation, although not subordinate to the Grand Lodge, was under the compelling fraternal obligation to cooperate with the request of the Grand Lodge to participate in both such hearings and, therefore, such parties did not voluntarily enter into any contract of arbitration. The Temple Corporation further contends that we overlooked and misinterpreted the fact that the hearings held before the committees were Grand Lodge proceedings. We think we have amply demonstrated in the opinion that they could not have been Grand Lodge proceedings inasmuch as the Temple Corporation admits that it was not subordinate to the Grand Lodge and, therefore, was not subject to any proceeding of the Grand Lodge. Its contention that it did not voluntarily enter the proceedings has been amply refuted in the opinion. The fact is that it was the Temple Corporation that voluntarily solicited the aid of the Grand Master when it asked that he "somehow" interpose his influence in its behalf. There is not the slightest bit of evidence in the record to support the contention that the Temple Corporation was under any obligation, fraternal or otherwise, to enter into

the hearings. The record demonstrates clearly that it entered into these hearings voluntarily and not under any compulsion.

■ The Temple Corporation further contends that the purpose of the hearings "* * * was to enlist the influence of the Grand Lodge over West Gate, as its subordinate Lodge, in aiding Temple Corporation to persuade West Gate of the continuing validity of the obligation of West Gate to contribute its share of the cost of maintenance of the Temple Building * * *" and that Temple Corporation participated in the hearings "* * * without surrender of the right of Temple Corporation to resort to the Courts * * *" if the decisions of the hearing committees were not in its favor. Such a contention amounts to saying that if we (Temple Corporation) gain a favorable decision from the committee we will insist on West Gate Lodge executing the determination and award of the committee but if the determination is not such as is in our favor or suits us then we are free to resort to the court. Such a contention contains its own refutation. No doubt the Temple Corporation was confident of success before the committees and no doubt this confidence caused it to enter into the proceedings. It voluntarily submitted to the hearings, although it could have refused to do so, inasmuch as it was not subordinate to the Grand Lodge or its authority or to the Grand Master or his authority.

■ The Temple Corporation points to the fact that the word "arbitration" was not mentioned by it. It is true that the Temple Corporation did not use the word "arbitration" and it was not used in the proceedings until the report of the Jurisprudence Committee was made. But as we have pointed out in the opinion the Temple Corporation initiated the hearings, voluntarily submitted to the hearings, participated in them and urged the committees to finally determine the controversy. In the proceeding before the Jurisprudence Committee the President of the Temple Corporation indicated the hearing before the committee was analogous and comparable to a proceeding of a court. We think the proceedings contained all the attributes of arbitration hearings and the same thought was entertained by the Jurisprudence Committee in its report.

The Motion for Rehearing is overruled.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.