**Harvey JONES and Elizabeth Jones, Respondents,**

v.

**Mary Mildred DeWITT, an individual, and Mary M. DeWitt, as Executrix of the Estate of Roger DeWitt, deceased, Appellants.**

No. 56816.

Supreme Court of Missouri, Division No. 1.

Sept. 10, 1973.

Rehearing Denied Oct. 8, 1973.

Hogsett, Shaffer & Gibson, James W. Shaffer, Joseph R. Hogsett, Sherman L. Gibson, Kansas City, for respondents.

Rufus B. Burrus, Independence, W. Raleigh Gough, Kansas City, for appellants.

WELBORN, Commissioner.

Action for specific performance of option contract for the sale of real estate. Trial court granted specific performance and awarded plaintiffs judgment for $46,520.87 for overpayment under the contract. Defendants appealed.

The land which is the subject of this litigation is a tract of approximately 205 acres, presently within the boundaries of the city of Independence, Missouri. In 1957, the property was owned by Billy Flournoy, the widow of William Flournoy and the estate of Kenneth Flournoy, the beneficiary of which was Rose Flournoy Harrelson. Both Billy and Rose were non-residents. Martin B. Dickinson was executor of the estate of Kenneth Flournoy, with power of sale. Dickinson had received numerous offers to purchase the property, including one under date of September 18, 1958, by plaintiff-respondent Harvey A. Jones to pay $100,000 for the property. Jones made his offer through an Independence realtor with whom he deposited $1,000 as earnest money.

Jones and his wife were social friends of Roger DeWitt and his wife, Mary Mildred, who lived in Independence. According to Jones, DeWitt learned of Jones' offer and was anxious to join with Jones on the deal. He gave Jones $500 as one half of the earnest money. The offer was rejected and Jones returned the $500 to DeWitt by a check dated November 3, 1958.

In December 1958, DeWitt and his wife and Jones and his wife jointly made an offer of $140,000 for the property. This offer was accepted. The transaction was closed in late December. The purchase price was paid in cash furnished by DeWitt and two short term notes, paid by DeWitt. The deeds, to DeWitt as grantee, were filed for record on December 26, 1958.

In February 1959, the Joneses and DeWitts entered into the agreement which is the basis of this litigation. Omitting the description of the property involved, the agreement read as follows:

"THIS AGREEMENT Made this ———— day of February, 1959, by and between Roger DeWitt and Mary Mildred DeWitt, his wife, hereinafter referred to as first parties, and Harvey Jones and Elizabeth Jones, his wife, hereinafter referred to as second parties.

"WHEREAS, first parties are the owners of the following described property in Jackson County, Missouri, to-wit:

* * * ;

being approximately 205 acres, having purchased the same on December 24, 1958, for the sum of $140,000.00; and,

"WHEREAS, first parties have caused to be filed certain applications for rezoning said property with the proper zoning officers, it being requested in said applications that a portion of said premises be zoned for residential use and a portion thereof zoned for business purposes; all as more fully set out in said applications; and,

"WHEREAS, second parties have indicated their desire to purchase an undivided 40% interest in the aforedescribed real estate and to exercise their best efforts along with first parties in the development of said property for whatever uses the parties hereto may hereafter determine; and,

"WHEREAS, in connection with the use and development of the aforedescribed real estate, the parties have discussed the possibility of forming a corporation to carry title to said real estate and to develop said land in any manner determined by the board of directors of any such corporation; and

"WHEREAS, the parties desire to enter into this written agreement setting out the terms and conditions of their understanding in detail.

"NOW THEREFORE, for and in consideration of the sum of $32,000.00 to first parties in hand paid, the receipt of which is hereby acknowledged, and in further consideration of the mutual covenants and agreements herein contained, it is stipulated and agreed by and between the parties as follows:

"(a) First parties hereby grant to second parties an option to purchase an undivided 40% interest in all of the real estate described herein for the sum of $24,000.00. This option may be exercised at any time after July 1, 1959, but not before, and it shall expire and be null and void from and after August 31, 1959. In the event the real estate described herein is sold to any corporation controlled by first parties, then first parties will protect second parties' interest and cause to be sold to second parties the number of shares in any such corporation which will accurately reflect the interest in the real estate for which an option is hereby given. In the event said real estate is sold to any person, firm, corporation or co-partnership of persons (other than a controlled corporation), then first parties will pay to second parties 40% of the net sum received from any such sale less the sum of $24,000.00.

"(b) All expenses incurred in the development, sale or promotion of said land shall be paid by first parties, but if second parties elect to exercise the option granted herein, then second parties shall, upon such election, refund to first parties 40% of all sums expended by first parties.

"(c) It is understood between the parties that Harvey Jones, one of second parties, is an engineer and surveyor by profession, and is experienced in the layout and engineering of sites for subdividing. He agrees herewith to perform such services in preparing the land herein described for such purpose in the event second parties elect to exercise the option herein granted and in the event the parties determine between themselves to subdivide said area. He further agrees that any such work will be done at actual time and expense and that no charge shall be made for his personal supervision or services. The parties agree that at such time as it is determined to subdivide said land, if such determination is made, the parties will enter into a contract for such work in which will be set out all of the services to be performed and the charges to be made.

"(d) In the event the land herein described is sold to a corporation which is controlled by either or all of the parties hereto prior to the date the option herein granted is exercised, if so, then second parties shall be entitled to purchase for the sum of $24,000.00 a sufficient number of shares of such corporation to assure them of an interest in said corporation equal to 40% of the value of the land herein described regardless of the fair market value

thereof at said time or of the price paid for said land by such corporation. Upon the transfer of title to said land, the option contained in paragraph (a) hereof shall terminate and the provisions of this paragraph (paragraph d) shall prevail; it being the intention of the parties that at no time shall second parties be entitled to purchase more than a 40% interest in said venture. It is further agreed that should said land be sold to such a controlled corporation, that the parties will execute a · stock purchase agreement limiting the sale of the stock of the corporation so as to prevent the introduction of outside stockholders without the consent of all parties.

"(e) First parties agree to lend to second parties the sum of $24,000.00 to be used by second parties to purchase the 40% interest herein provided for, in the event second parties elect to exercise the option herein granted. Second parties agree to secure said loan by executing their promissory note in the amount of $24,000.00 payable five years from the date of execution thereof, with interest at the rate of 6% per annum. Said note shall provide for prepayment privileges, and shall be secured by a first deed of trust on the 40% interest of second parties in the property herein described, together with the deposit with said first parties as collateral under a collateral pledge agreement of the following items:

"(1) $28,750.00 in face amount of notes executed by Kentucky Hills, Inc., and payable to second parties or their order.

"(2) 200 shares of capital stock of Kentucky Hills, Inc., issued to second parties.

"Time is of the essence of this contract.

"IN WITNESS WHEREOF, the parties have hereunto set their hands the day and year first written."

As recited in the agreement, Jones was an engineer. According to him, as soon as the property was sold, he began working on plans for developing and selling the property. He discussed the plans with the DeWitts on numerous occasions. Jones stated that he and DeWitt bought the property, intending to develop it for sale. According to Mrs. DeWitt, "Well, we didn't buy to develop it. Roger DeWitt wasn't a builder. He was an automobile man back from 1921. He knew nothing about developing and we weren't putting any more money into it for anybody or for anything."

Jones testified that his office staff prepared plans and zoning exhibits involving proceedings in which the zoning was changed to residential and business property.

In September 1959, DeWitt and Jones filed an application with the Jackson County Board of Zoning Adjustment for authorization to establish a sewage disposal unit consisting of five oxidation basins on the property. According to the order granting the permission, the board found that "Mr. J. Roger DeWitt is the owner of 205 acres of ground on which he plans to construct approximately 500 homes."

Jones prepared plans and profiles for the basins. His plans are dated July 10, 1959. A "Plan of Proposed Rogers Park, Independence, Mo. for J. Roger DeWitt & Harvey A. Jones," dated July 13, 1959, was prepared by Jones.

On September 1, 1959, the DeWitts entered into a contract with the Bishop of the Kansas City Diocese for the sale of 15 acres in Rogers Park for $42,000. By the terms of the contract, the DeWitts agreed to construct a sewage oxidation lagoon on their land and to provide a connection from the land purchased by the Bishop to the lagoon. They also agreed to construct a permanent gravity flow sanitary sewer across the land purchased by the Bishop and to dedicate certain areas for streets and improve them for such purpose. The property was transferred to the Bishop, but the DeWitts did not carry out the projects to which they had agreed. In December 1965, the Bishop filed suit in the Jackson

County Circuit Court for $75,000 damages for the DeWitts' default. That suit was ultimately settled in May 1967 by the payment by DeWitt to the Bishop of $55,000 and the 15-acre tract was reconveyed to DeWitt.

Jones surveyed the boundaries of the 15-acre tract before it was sold. In December 1959, he made a general street layout plan for the 205 acres with topographical lines, based on an aerial survey Jones obtained in June 1959, and for which he paid $706.80.

In November 1962, Rogers Park, Inc. was organized, with an authorized capital of 500 shares of $100 par value each. The incorporators were J. Roger DeWitt, with two shares, Mary Mildred DeWitt, one share, Harvey A. Jones, one share, and Floyd R. Brown, one share. Brown was the DeWitts' accountant. According to Jones, the property was to be transferred to the corporation, but this was never done, the corporation was inactive and eventually its charter was forfeited. Jones said that DeWitt drew a check for $42,000 to transfer the proceeds of the sale of the property to the Bishop to the corporation, but changed his mind and tore up the check.

On April 28, 1965, the DeWitts authorized a real estate broker to sell 147 acres, zoned for residential purposes, of Rogers Park for $2,000 per acre. The authorization specified the terms of the sale, including the requirement that the purchaser assume the obligation of the agreement with the Bishop. The agent found an interested purchaser who was willing to buy the property. The purchaser and agent met with the DeWitts and Jones, but the deal fell through when DeWitt raised the asking price to $3,000 per acre.

As the terms of the February 1959 agreement above show, Jones was granted an option to purchase a 40% interest in the property. He was to pay $32,000 for the option and $24,000 upon its exercise between July 1, 1959 and August 31, 1959.

The agreement recited the payment and receipt of the $32,000. Jones did not testify about such payment. In the papers of DeWitt, there were discovered, following his death in 1968, three documents each bearing the date of February 25, 1959. One, on Jones' letterhead and admittedly bearing his signature, was adressed to no one and stated:

"This is to advise that I agree to pay six per cent (6%) interest on forty per cent (40%) of all the money J. Roger DeWitt has advanced up to the time of this agreement relative to the Flournoy land."

The second document was a demand note for $32,000 payable to Roger DeWitt and Mary Mildred DeWitt, with interest at 6% until paid, and purporting to bear the signatures of Harvey A. Jones and Elizabeth D. Jones. No one who saw the note signed testified and when it was offered in evidence, the court stated that it must ultimately determine whether the signatures were those of the Joneses. There is no record of his determination, but comparison of the signatures with admitted signatures of the Joneses leaves no doubt that the note bears their signatures. See Kramer v. Johnson, 361 Mo. 1085, 238 S.W.2d 416, 422 [8–11] (1951).

The third document was an Arizona mortgage, covering land in Maricopa County, Arizona, from the Joneses to the DeWitts to secure a demand note of $32,000 of even date from the Joneses to the DeWitts. The mortgage was never recorded.

On October 15, 1959, Jones gave DeWitt a check for $1,680 "For Int." A check for the same amount was given DeWitt on February 22, 1960 "For Interest Rogers Park." In March 1960, Jones paid DeWitt $20,000 by check; on February 21, 1961, $1,250 and on November 3, 1961, $2,683.29. No explanation for the amount of the latter two checks appears. The combined amount of the first two checks, $3,360, is the equivalent of one year's interest at 6% on $56,000.

Near the end of 1959, DeWitt's accountant furnished Jones with a memorandum, showing the profit on the sale of the property to the Bishop based upon a 40% interest in the property. By his federal income tax return, Jones reported such amount as income and paid taxes on it.

According to Jones, he quit paying DeWitt in cash after the November 1961 payment although he continued to work on the Rogers Park development. Jones explained his reason as follows:

"Over a period of years, I had made considerable contributions to this enterprise. Through that same number of years, I began to see that it was apparent that Roger was not going to go through with the original intent of our association.

\*    \*    \*    \*    \*    \*

"The record shows he didn't do anything.

\*    \*    \*    \*    \*    \*

"Well, I didn't do too much pencil work on computations of my additions of my contributions to the cause. I felt I was very near my contributing forty percent of my original agreement with him on the purchase of the property, either through cash payments or through gain of the sale to the Catholics, or through the contributions of my office for engineering services."

Mrs. DeWitt testified that her husband was unwilling to enter into the development of the property on the basis of his providing the money and Jones the engineering services.

Roger DeWitt died November 22, 1968. This action was begun January 31, 1969.

The original petition, in which Harvey Jones was the sole plaintiff, alleged the making of the contract with the option, the payment of the $32,000 down, receipt of which was acknowledged in the agreement, and the execution of a note for $24,000 for the exercise of the option. The first amended petition alleged that the $32,000

down payment and the $24,000 option note were incorporated into a $56,000 note executed on or about December 21, 1958. The petition alleged that plaintiff was ready and willing to perform the agreement and offered to pay the balance due on the $56,000 note with interest upon conveyance of a 40% interest in the land to plaintiff.

The answers of Mildred DeWitt personally and as executrix to the first amended petition alleged that the option granted plaintiff had long since expired; pleaded the 10-year statute of limitations (§ 516.-110(1), RSMo 1969, V.A.M.S.), a defect of parties in that Elizabeth Jones, a party to the agreement, was not joined as a party, laches and nonpayment of the amounts fixed by the agreement.

By his reply, plaintiff averred that the agreement "speaks for itself regarding payment of the $32,000 referred to therein," and alleged that plaintiff had performed work on the property of the value of $8,000 and had paid a total of $24,610 in compliance with the agreement.

On November 4, 1970, at a pre-trial conference, plaintiff amended his petition by adding his wife as a party.

Mrs. DeWitt, individually and as executrix, filed amended answers and cross-petitions, admitting the execution of the agreement and the sale of the land to the Catholic Bishop. The answers further alleged an agreement by Jones to pay 6% interest on 40% of DeWitt's investment in the land to the date of the February 1959 agreement; that despite the acknowledgment of receipt of $32,000 in the agreement, that amount was represented by a $32,000 note secured by a mortgage on Arizona lands; that the note was accepted as conditional payment; that $20,000 had been paid on the principal, leaving a balance of $12,000 due and unpaid. The answer also alleged that plaintiff had paid and defendants accepted money as interest on the mistaken assumption that plaintiffs were indebted for the whole $56,000, whereas they were indebted only for the $32,000 note and

would not become obligated to pay the $24,000 until the option was exercised.

The answer further alleged that the option had not been exercised during its term and had been allowed to expire; that thereafter, in the hope or expectation that a new contractual arrangement might be worked out, the parties negotiated with each other and plaintiff made principal and interest payments, but the negotiations having failed, Jones abandoned the purchase of any interest in the land and DeWitt made no further effort to collect on the $32,000 note which became barred by limitations.

The answer alleged other defenses which will be referred to hereafter. The cross-petition sought to quiet title in defendants and offered to refund such payments on the $32,000 note as the court might require to do justice and equity.

Plaintiffs filed a reply in which they alleged that the agreement spoke for itself regarding the payment of the $32,000; that Jones performed work of the value of $10,000; paid $24,610 in checks, was entitled to a credit of $12,286.44 from the sale of the property to the Catholic Diocese and to a credit of $6,636.77 from rentals received on the property. The reply further alleged that if it be determined that plaintiffs had not timely exercised the purported option, such failure was waived by defendants.

A motion to strike the allegation seeking credit for work and other items and the waiver on the grounds that such matters were required to be stated in the petition was overruled.

The trial court's findings of fact may be summarized as follows:

The court found: that plaintiffs paid defendants $59,273.29 during 1959, 1960 and 1961 and furnished engineering services of the "reasonable value" of $10,000, not including Harvey Jones' personal services; that defendants' books showed a credit to plaintiffs of $15,886.44 from the Catholic Church sale and of $412.52 and $1,195.15 from rents; and a further credit of "accounts payable," in the sum of $11,957.20; that plaintiffs had paid $27,293.29 in addition to the $32,000 acknowledged as received in the option contract, were entitled to $10,000 for engineering services and $706.80 for aerial topography map, and for such "credits" above referred to, or a total credit of $99,451.40; that defendants had received a total of $16,591.94 in rents from the property and had not remitted any of such total to plaintiffs; that the Catholic Church sale failed "not through any fault of plaintiffs."

Its conclusions of law included the following matters: that "by their entire course of conduct" plaintiffs exercised the option and defendants "waived any failure of plaintiffs to formally exercise the option."; that defendants are entitled to a credit of 6% per annum on $56,000 from December 10, 1958 to February 25, 1959 and on $24,000 from February 25, 1959 to February 21, 1961; and that, all credits considered, "plaintiffs are entitled to recover $46,520.87 from defendants."

The decree also found and concluded that defendants occupied a "confidential relationship" toward plaintiffs. It further provided that the court "does hereby amend the pleadings to conform to the evidence."

■ The first point on this appeal is that Jones' testimony regarding his dealings with Roger Dewitt is inadmissible under the Dead Man's Statute. § 491.010, RSMo 1969, V.A.M.S.

The evidence established that, although title to the Rogers Park property was in the name of Roger DeWitt alone, the property was an asset of the partnership of Roger and his wife, doing business as DeWitt Company. Mrs. DeWitt stated in response to an inquiry as to whether she was "an active partner in this proposition with J. Roger DeWitt": "Listen, I was active with him in everything he did." Jones testified that the conversations which he had

with DeWitt were at DeWitt's home, in the presence of Mrs. DeWitt "generally always there." Mrs. DeWitt testified that she was present at not more than three or four conversations between her husband and Jones regarding the Rogers Park project.

On this record, the trial court correctly admitted Jones' testimony regarding his dealings with Roger DeWitt because the Dead Man's Statute is not applicable. This case is governed by the rule stated in Robinson v. Trimble, 68 S.W.2d 732, 734 (Mo.App. 1934). "[T]he death of one of the partners or co-contractors, and while the other partner or co-contractor is living, does not of itself render the plaintiff incompetent to testify in a case against the deceased with reference to a contract made with both the deceased and the living partner or co-contractor." See Wahl v. Cunningham, 320 Mo. 57, 6 S.W.2d 576, 586–587[8–10] (banc 1928).

The primary question presented is whether, considering Jones' testimony with the other evidence, a case was made for the specific performance of the February 1959 agreement under which Jones was given an option to purchase a 40% interest in the Rogers Park property. "There are two propositions that are fundamental in the law of specific performance. The one is that the court will not make a contract for the parties, and that if it undertakes to enforce their own contract, it will require the performance of neither more nor less than that which the parties themselves have agreed to do. Baldwin v. Corcoran, 320 Mo. 813, 7 S.W.2d 967; Rayburn v. Atkinson [Mo., 206 S.W.2d 512], supra. The other is that the party who seeks relief must show his performance or offer of performance of every essential obligation resting upon him before the other party may be compelled to perform. Parkhurst v. Lebanon Publishing Co., 356 Mo. 934, 204 S.W.2d 241; Long v. Rogers, Mo. App., 185 S.W.2d 863." Drake v. Hicks, 249 S.W.2d 358, 360[3, 4] (Mo.1952).

The trial court in this case did not find that plaintiffs had performed the contract which they sought to enforce. The court found that plaintiffs by their course of conduct in paying money and providing services exercised the option and that defendants by their course of conduct waived formal exercise of the option by plaintiffs. The court also found that both parties, by their conduct, treated the option as having been fully exercised.

■ In considering the correctness of this finding and conclusion, certain erroneous conclusions of fact and law by the trial court must first be dispensed with. The trial court's determination was premised, in part, upon its finding that a confidential relationship existed between plaintiffs and defendants in this transaction. The pleadings afford no basis for premising any action on such basis. In its decree, the trial court stated that "the Court * * * does hereby amend the pleadings to conform to the evidence * * *." Whether the court thereby intended to inject the confidential relationship issue in the case is not clear, but that could provide the only possible basis under the pleadings for such issue and finding.

The purpose of pleadings is to define the issues for trial. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 55.54, V.A.M.R. There is no hint whatever that this case was tried on the theory of a confidential relationship between plaintiffs and defendants. Plaintiffs made no attempt to amend their pleadings to claim such relationship and there is no basis for amendment of the pleadings to inject such issue in the case. In the case of Chapman v. Breeze, 355 Mo. 873, 198 S.W.2d 717 (1946), relied upon by respondents, a plaintiff who was successful in obtaining specific performance of an option contract was alleged and found to have stood in a confidential relationship with the defendant. In this case, neither the pleadings

nor the evidence support the finding and conclusion and it must be ignored.

■ The trial court found that plaintiffs made repeated requests to defendants to convey a 40% interest in the land and to send plaintiffs evidence of a credit to plaintiffs of 40% of the proceeds of the sale to the Catholic Diocese, and that defendants "continually promised to do so, but never did."

The evidence does not support such finding. Jones' testimony on requests for the transfer of an interest in the property to him was as follows:

"Q Did you ever make any mention, sir, about whose name the property was in, any complaints?

"A Well, I kept wondering why we couldn't get it to the point that it was originally agreed that we would be, that I would have title to forty percent of it.

     *    *    *    *    *    *

"Q Did you ever ask Roger DeWitt when he was going to put the property in your name, or in all four names, the names on the real estate contract?

"A I mentioned a minute ago that I was endeavoring to get to that point all along, but it never did get accomplished. I ran out of trust or hope or whatever you might call it."

In neither of Jones' answers to the question did he state that he had requested transfer of the property and that defendants refused to make such transfer. He "wondered" about his 40% share and "was endeavoring to get to that point all along," but he did not state that the matter was ever directly presented to defendants.

On the credit issue, Jones testified that defendants' accountant furnished him with the computation of his share of the profit on the sale to the Catholics. His testimony further was as follows:

"Q Now, Mr. Jones, did Roger DeWitt give you credit for forty percent of the money from the Catholic Dioceses?

"A No.

"Q Did he ever say anything about that?

"A No.

"Q Did you ever ask him about it, as a matter of fact?

"A No."

If the trial court's decree is to be sustained, it must be on the basis of the findings that defendants waived performance according to the terms of the contract and considered the option as having been exercised by plaintiffs.

■ The evidence would warrant the inference that the parties from the inception operated on the assumption that the option would be exercised. Such assumption could be premised on plaintiffs' payment of interest during the first year following the agreement which equaled 6% of the amount which plaintiffs were to pay for the option and its exercise. Such payments would also have been premised upon the indebtedness by Jones to DeWitt of the entire $56,000, thus indicating that, despite the recital in the agreement of the receipt of the payment of $32,000, the payment of that sum had been by way of the demand note in that amount, bearing the date of the agreement, and calling for interest at the rate of 6% per annum. The recital of the agreement was not conclusive of the payment in cash of the $32,000. Hardin v. Ray, 404 S.W.2d 764, 771[11, 12] (Mo. App.1966), and cases therein cited in footnote 8. There was no showing that the note was other than a conditional payment of the $32,000. Wolfson v. Baltimore Bank of Kansas City, 157 S.W.2d 560, 565–566[4, 5] (Mo.App.1942); Scheer v. Brooks, 333 Mo. 1201, 65 S.W.2d 107 (1933). The trial court erroneously considered the $32,000 to have been paid in arriving at its decree.

The contract for the sale of the 15-acre tract to the Bishop was dated September 1, 1959. Just when the transaction was completed does not appear. However, despite

the requirement that Jones exercise the option prior to August 31, 1959, and the absence of any evidence of any formal step on his part to do so, the DeWitts did provide on their books a credit for Jones in an amount equal to 40% of the net proceeds of the sale. Such action on the part of the DeWitts at least evidences a waiver of the time set in the agreement for exercise of the option.

The subsequent acceptance of the $20,000 payment in March 1960, and of the lesser amounts in February and November, 1961, would also indicate such waiver, as would the settting up on the DeWitts' books of credit for a 40% share of the rents from the property for periods ending August 31, 1960 and August 31, 1961.

However, it is clear that such payments and credits would not have satisfied the total obligation of Jones for the payment of $56,000 to the DeWitts. Considering the two $1,680 payments as interest, the total payments and credits would have amounted to $41,427.40, computed as follows:

| | |
|---|---|
| Checks | $23,933.29 |
| Credit on sale | 15,886.44 |
| Rents | 412.52 |
| | 1,195.15 |
| | $41,427.40 |

In these circumstances, Jones made what appears to have been a unilateral determination that such payments plus his "contributions to the cause" had put him "very near my contributing forty percent of my original agreement with [DeWitt] on the purchase of the property * * * ."

■ The contract which Jones is now seeking to enforce did provide that, in the event the option was exercised and the parties decided to subdivide the property, Jones would provide engineering services "at actual time and expense." There is no provision in the agreement that such services would be considered in payment of the option price and no evidence that DeWitt ever agreed to accept such services for such purpose. In crediting Jones with the $10,000 which he testified was the value (not cost) of the services provided by his firm, the trial court was writing into the agreement something to which the parties had not agreed and was not limiting itself to the enforcement of the contract to which the parties had agreed and upon which plaintiffs relied.

■ Although the evidence would warrant the conclusion that the parties acted from the time of the agreement as if the option would be exercised, the evidence does not support the conclusion that the parties treated the transaction as if the option had in fact been exercised. Thus, credits for rent and the Catholic sale were set up on the DeWitt books, but no payment was made on such account to Jones. There was no evidence of any credit to Jones for rent following the entry of August 31, 1961. This is noteworthy in view of Jones' statement that following the November 1961 payment he decided to make no further payments.

The trial court did find that a credit to Jones in the amount of $11,957.20 appeared on the DeWitt Books as of August 31, 1967. This finding was based upon a sheet from the DeWitt Company records, entitled "Adjusting Journal Entries 8-31-67." The items here involved appeared as follows:

| | | |
|---|---|---|
| "LAND—ROGERS PARK | 7,664.19 | |
| "PRIOR GAIN ON SALE OF LAND (LONG TERM LOSS) | 17,535.81 | |
| "INTEREST | 17,842.80 | |
| "ACCOUNTS PAYABLE H A JONES | 11,957.20 | |
| "ROGERS PARK | | 55,000.00 |

"TO RECORD SETTLEMENT WITH DIOCESE ON PAST SALE OF LAND WHICH DEWITT CO. HAD TO REPURCHASE BECAUSE OF DEFAULTING ON THE CONTINGENCIES OF THE CONTRACT"

This entry shows the accounts to which the $55,000 paid on settlement of the lawsuit by the Diocese was to be charged. The total of the amount in the first column is $55,000. The entry does indicate that at that time there was on the DeWitt books an account payable to Jones in connection

with Rogers Park. Since there had never been any payment to Jones of the sum originally credited to such account on the sale, it can reasonably be assumed that the $11,957.20 standing to Jones' credit arose from that transaction and that upon the repurchase of the property, a portion of the payment was charged against that account.

The formation of Rogers Park, Inc. does not demonstrate that the parties treated the option as if it had been exercised. Jones as an incorporator received only one of the five shares issued. There is no accounting for this proportionate share accorded Jones. Certainly it is not referable to the February 1959 contract and does not evidence fulfillment of that agreement. Respondents see the issuance to Jones of only 20% of the original shares as an "arbitrary" reduction in Jones' interest in Rogers Park. There is no evidence that any sort of coercion was involved in Jones' becoming an incorporator for the corporation. He must have known of the allocation of the incorporating shares, but there is no evidence of complaint by him at the time.

Apparently Jones was present at some of the negotiations involved in the proposed 1965 sale of a part of the property. Again, it is obvious that in his dealings in that matter, DeWitt did not consider and treat Jones as a co-owner of the property.

There is no further evidence in the record to support the trial court's findings. There was testimony by Mrs. DeWitt that she listened in on a telephone conversation between her husband and Jones in which her husband told Jones that he was going to put no more money into Rogers Park. Jones responded, "I want out. I am not going to pay you another blankety-blank cent of interest. I want out." Mrs. DeWitt said that her husband told Jones to come over and discuss the matter. Mrs. DeWitt stated that she never subsequently saw Jones or heard his voice. The date of this conversation was not fixed with any degree of certainty. Mrs. DeWitt placed it as a month or two before the suit by the Bishop against the DeWitts.

While that suit was pending, DeWitt's attorney attempted to talk to Jones and find out what he knew about the plans of the church for the property. Jones' response was, "I haven't got anything to say to you about it."

At best the telephone conversation between DeWitt and Jones might support a finding of waiver by DeWitt which would extend even to the date of that conversation, but inasmuch as Jones did not take advantage of such waiver, the evidence is unavailing on his behalf.

The conversation regarding the suit by the Bishop does demonstrate a lack of concern with the litigation, inconsistent with a position of an ownership interest in the property affected.

■ ■ Review of the evidence clearly demonstrates that Jones did not accept the option according to its terms. The conclusion that such acceptance may be excused because the parties from the date of the execution of the agreement considered it to have been accepted and acted thereafter on that basis is unwarranted. At the most, the evidence showed waiver of strict compliance with the terms of the option agreement, particularly as to the time of acceptance. However, such waiver would extend the time for only a reasonable term. Suhre v. Busch, 343 Mo. 170, 120 S.W.2d 47, 56 (1938). There is no evidence in this case that plaintiff at any time prior to the filing of this lawsuit acted to exercise the option. Nor did the evidence show any steps on his part to place the optionor on notice that he considered his performance of the terms of the option completed and that he was entitled to a conveyance.

In such circumstances, plaintiffs have not demonstrated that they are entitled to have the contract specifically enforced. Drake v. Hicks, supra.

■ It may also be observed that plaintiffs never offered to perform in accord-

**536**

ance with the terms of the contract, which called for payment of the amount due on exercise of the option by a note secured by certain collateral. The vendor had the right to insist upon payment in this manner. See Drake v. Hicks, supra.

 The defense of laches was also a valid defense to plaintiffs' claim. According to Jones, he had concluded late in 1961 that he had performed his part of the agreement and was entitled to a conveyance of a 40% interest in the property. He took no action to enforce his claim until this suit was filed on January 31, 1969. His explanation for failing to act earlier was: "Social reasons. Also I began to detect that [Roger DeWitt] was not a well man, wasn't in me to go after a person in that condition."

Mr. DeWitt died November 2, 1968. According to his widow, he had emphysema, which became disabling during the last ten months of his life.

The delay in bringing suit by plaintiffs involved two items of detriment to the defendants. The death of Roger DeWitt deprived defendants of much evidence as to the details of the dealing between Jones and DeWitt. It has previously been held that Mrs. DeWitt's acknowledged participation in the partnership affairs was sufficient to avoid the Dead Man's Statute. However, it is clear that the dealings with Jones were handled primarily by Mr. DeWitt. In addition, during the period of Jones' delay, the property increased in value sharply. Witnesses generally agreed that the $140,000 price paid by DeWitt was a fair price for the property in 1958. The trial court found that the value of the property at the time of the trial in 1970 was $780,000.

These circumstances sustained defendants' plea of laches. Suhre v. Busch, 343 Mo. 170, 120 S.W.2d 47, 56–57 (1938); Brandt v. Manson, 207 S.W. 2d 846, 853 [6] (Mo.App.1948); Younger v. Evers, 333 Mo. 931, 64 S.W.2d 936, 939 [4] (1933).

The trial court should have denied the relief of specific performance, and should have entered judgment quieting title in accordance with the counterclaim for such purpose by Mrs. DeWitt. Inasmuch as the defendants have offered to return the payments made in order to avoid the appearance of a forfeiture, the entry of a final decree quieting title should be conditioned upon the payment to plaintiffs of the amount paid in cash by plaintiffs, or $27,293.29.

Reversed and remanded with directions.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

All of the Judges concur.